1  R. Rex Parris (SBN 96567)
          rrparris@parrislawyers.com
2  Kitty K. Szeto (SBN 258136)
          kszeto@parrislawyers.com
3  John M. Bickford (SBN 280929)
          jbickford@parrislawyers.com
4  Ryan A. Crist (SBN 316653)
          rcrist@parrislawyers.com
5  **PARRIS LAW FIRM**
   43364 10th Street West
6  Lancaster, California 93534
   Telephone:     (661) 949-2595
7  Facsimile:     (661) 949-7524

8  Attorneys for Plaintiff and the Putative Class

9

10               **UNITED STATES DISTRICT COURT**

11               **EASTERN DISTRICT OF CALIFORNIA**

12

13  JOHN PEREZ, on behalf of himself and on behalf )   Case No. 1:17-cv-00686-AWI-BAM
    of all other similarly situated individuals,      )
14                                                     )   **CLASS ACTION**
                 Plaintiff,                            )
15                                                     )   **PLAINTIFF'S MEMORANDUM OF POINTS
          v.                                           )   AND AUTHORITIES IN SUPPORT OF
16                                                     )   MOTION FOR CLASS CERTIFICATION**
    LEPRINO FOODS COMPANY, a Colorado                  )
17  Corporation; LEPRINO FOODS DAIRY                   )   Date:       May 8, 2020
    PRODUCTS COMPANY, a Colorado                       )   Time:       1:30 p.m.
18  Corporation; and DOES 1-50, inclusive,            )   Courtroom: 2
                                                       )   Judge:      Anthony W. Ishii
19               Defendants.                           )
                                                       )
20                                                     )
                                                       )
21                                                     )

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page(s)**

**TABLE OF AUTHORITIES**...................................................................................... iii

**INTRODUCTION**................................................................................................1

**FACTS**..............................................................................................................2

    **A.**    **Leprino is a large cheese manufacturer with a plant in Lemoore East that operates continuously.**......................................................................................... **2**

    **B.**    **Leprino's meal and rest break policies are facially non-compliant, leading to significant violations.** ............................................................................................ **2**

        1.    Leprino's common meal break policies are facially unlawful................................2

        2.    Leprino's common rest break policies are facially unlawful................................3

        3.    Leprino's time and payroll data show significant violations. ..............................4

    **C.**    **Leprino requires its employees to remain "on call" during meal and rest periods.** ............... **5**

        1.    Leprino requires workers to be constantly available to answer their supervisor's questions and follow their instructions..................................................5

        2.    Workers must answer their radios, listen for their names on the intercom, respond to calls in the break room, and respond to supervisors in-person while on breaks. ..................5

        3.    Leprino holds workers responsible for any errors that occur throughout their shift, even if they occur during a meal or rest break. ..............................................7

    **D.**    **Leprino requires employees to pass through a red-line room, scrub their boots, and wash their hands during their breaks.** ...................................................................... **8**

    **E.**    **Leprino requires its employees to don and doff prior to clocking-in, and after clocking out in excess of 14 minutes.** ....................................................................... **9**

i

## TABLE OF CONTENTS

**Page(s)**

LEGAL STANDARD ..................................................................................................11

ARGUMENT ............................................................................................................12

I.    ALL FOUR RULE 23(A) PREREQUISITES ARE MET. ...................................... 12

    A.    The class is sufficiently numerous to make joinder impracticable. ...................................12

    B.    There are common questions that will drive the resolution of the litigation........................13

        1.    Common questions will drive the resolution of Plaintiff's meal and rest break claims regarding the compliance of its uniform policies............................................14

        2.    Common questions will drive the resolution of Plaintiff's "on duty" meal period claim.............................................................................................................19

        3.    Common questions predominate on Plaintiff's theory that Leprino fails to compensate its employees for required pre- and post-shift work in excess of 14 minutes. ...........................................................................................................20

        4.    Plaintiffs' remaining claims are derivative. ...........................................................22

    C.    Plaintiff's claims are typical of the claims and defenses of the class. ................................22

    D.    Plaintiff and his counsel are adequate. ..............................................................22

II.    RULE 23(B)(3) IS SATISFIED..............................................................................23

    A.    Common questions predominate over any purported individualized issues. ......................23

    B.    Class treatment is superior to litigating more than hundreds of individual cases. ...............25

CONCLUSION........................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

<u>Cases</u>

4

5  *Abdullah v. U.S. Sec. Assoc., Inc.*,

6    731 F.3d 952 (9th Cir. 2013) .................................................................................14, 20, 23

7  *Albert v. Aurora Behavioral Health Care*

8    (2015) 241 Cal.App.4th 388 ................................................................................................15

9  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

10    133 S. Ct. 1184 (2013)...................................................................................................12, 24

11  *Andrews v. Am. Tel. & Tel. Co.*,

12    95 F.3d 1014 (11th Cir. 1996) ............................................................................................24

13  *Antemate v. Estenson Logistics, LLC*,

14    No. CV 14–5255 DSF (RZx), 2015 WL 3822267 (C.D. Cal. June 15, 2015) ......................18

15  *Armstrong v. Davis*,

16    275 F.3d 849 (9th Cir. 2001) ..............................................................................................17

17  *Augustus v. ABM Sec. Servs., Inc.*,

18    2 Cal. 5th 257 (2016)...........................................................................................14, 16, 18

19  *Ayala v. U.S. Xpress Enterprises Inc.*,

20    No. EDCV 16-137-GW(KKx), 2017 WL 3328087 (C.D. Cal. July 27, 2017) ..................17, 18

21  *Bateman v. Am. Multi-Cinema, Inc.*,

22    623 F.3d 708 (9th Cir. 2010) ..............................................................................................11

23  *Boyd v. Bank of Am. Corp.*,

24    300 F.R.D. 431 (C.D. Cal. 2014)........................................................................................22

25  *Bradley v. Networkers Int'l, LLC*,

26    211 Cal. App. 4th 1129 (2012) .............................................................................1, 16, 22, 25

27  *Brewer v. Gen. Nutrition Corp.*,

28    11-CV-3587 YGR, 2014 WL 5877695 (N.D. Cal. Nov. 12, 2014)......................................18

iii

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

<u>*Cases*</u>

4

*Brinker Rest. Corp. v. Superior Court,*

5

    53 Cal. 4th 1004 (2012) ................................................................................. *passim*

6

*Butler v. Sears, Roebuck & Co.,*

7

    727 F.3d 796 (7th Cir. 2013) ................................................................................23

8

*Campbell v. Vitran Express Inc., No.,*

9

    CV 11–5029 RGK (SHx), 2015 WL 7176110 (C.D. Cal. Nov. 12 2015)................18

10

*Cervantez v. Celestica Corp.,*

11

    253 F.R.D. 562 (C.D. Cal. Jul. 30, 2008)................................................................19

12

*Cooper v. S. Co.,*

13

    390 F.3d 695 (11th Cir. 2004) ................................................................................24

14

*Dilts v. Penske Logistics, LLC,*

15

    267 F.R.D. 625 (S.D. Cal. 2010) ...........................................................................19

16

*Dukes v. Wal-Mart Stores, Inc.,*

17

    603 F.3d 571 (9th Cir. 2010).................................................................................22

18

*Dynabursky v. AlliedBarton Sec. Servs. LP,*

19

    No. 812CV2210JLSRNBX, 2014 WL 12690698 (C.D. Cal. Jan. 29, 2014) .......................20

20

*Edwards v. First Am. Corp.,*

21

    289 F.R.D. 296 (C.D. Cal. 2012)...........................................................................12

22

*Eisen v. Carlisle & Jacquelin,*

23

    391 F.2d 555 (2d Cir. 1968) ...................................................................................1

24

*Ellis v. Costco Wholesale Corp.,*

25

    285 F.R.D. 492 (N.D. Cal. 2012)...........................................................................13

26

*Gen. Tel. Co. of Sw. v. Falcon,*

27

    457 U.S. 147 (1982) ...............................................................................................12

28

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Ghazaryan v. Diva Limousine, Ltd.*,
  169 Cal. App. 4th 1524 (2008) .............................................................................1

*Giles v. St. Charles Health Sys., Inc.*,
  294 F.R.D. 585 (D. Or. 2013) ..............................................................................23

*Gonzales v. Arrow Fin. Servs. LLC*,
  489 F. Supp. 2d 1140 (S.D. Cal. 2007) ................................................................12

*Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) .............................................................................................11

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) .................................................................................................1

*Hanlon v. Chrysler Corp.*,
  *150 F.3d 1011 (9th Cir. 1998)* .......................................................................13, 24

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992 ...............................................................................22

*Herskowitz v. Apple, Inc.*,
  301 F.R.D. 460 (N.D. Cal. 2014) ........................................................................23

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  202 F.R.D. 12 (D.D.C. 2001) ..............................................................................13

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) ................................................................................24

*In re Rubber Chem. Antirust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................12

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) .............................................................................14

v

# **TABLE OF AUTHORITIES**

**Page(s)**

## *Cases*

*Levya v. Medline Indus., Inc.*
   716 F.3d 510 (9th Cir. 2013) ..................................................................................24

*Lewis v. First Am. Title Ins. Co.*,
   265 F.R.D. 536 (D. Idaho 2010) .............................................................................23

*Linder v. Thrifty Oil Co.*,
   23 Cal. 4th 429 (2000) ............................................................................................12

*Meyer v. Portfolio Recovery Assocs.*,
   707 F.3d 1036 (9th Cir. 2012) ...............................................................................13

*Morillion v. Royal Packing Co.*,
   22 Cal. 4th 575 (2000) .......................................................................................16, 19

*Naranjo v. Spectrum Sec. Servs., Inc.*,
   40 Cal. App. 5th 444, 460 (Ct. App. 2019) ...........................................................20

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .....................................................................13, 14, 22

*Patel v. Trans Union, LLC*,
   308 F.R.D. 292 (N.D. Cal. 2015) ...........................................................................23

*Phelps v. 3PD, Inc.*,
   261 F.R.D. 548 (D. Or. 2009) ................................................................................23

*Richmond v. Dart Indus., Inc.*,
   29 Cal. 3d 462 (1981) ...............................................................................................1

*Sav-on Drug Stores, Inc. v. Superior Court*,
   34 Cal. 4th 319, 326 (2004) ..............................................................................12, 23

*See's Candy Shops, Inc. v. Superior Court*,
   210 Cal.App.4th 889 (2012) ...................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**_Cases_**

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ...................................................................................22

*United Steel Workers Int'l Union v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) ...................................................................................12

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...................................................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)...............................................................................12, 13, 24

*Wang v. Chinese Daily News, Inc.*,
   *737 F.3d 538, 545 (9th Cir. 2013)* ...................................................................13, 23

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .................................................................................25

**Statutes**

California Labor Code § 226.7 ...........................................................................14, 17

California Labor Code §512 .....................................................................................14

California Labor Code § 1194, subd. (a) ..................................................................20

**Other Authorities**

American Law Institute, *Principles of Law of Aggregate Litigation* (2009) .................13

Charles Alan Wright, et al., *Federal Practice & Procedure* § 1778 (2d ed. 1986) .....................24

Charles Alan Wright, et al., *Federal Practice & Procedure* § 1779 (3d ed. 2005) ...............12, 25

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
   84 N.Y.U. L. Rev. 97 (2009) ...................................................................................13

William Rubenstein et al., Newberg on Class Actions (5th ed. 2011)...................13, 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Rules**

Fed. R. Civ. Proc. 23(a) ...........................................................................................................1, 11, 12, 25

Fed. R. Civ. Proc. 23(a)(1) ...........................................................................................................12

Fed. R. Civ. Proc. 23(a)(2) ...........................................................................................................13

Fed. R. Civ. Proc. 23(a)(3) ...........................................................................................................22

Fed. R. Civ. Proc. 23(a)(4) ...........................................................................................................22

Fed. R. Civ. Proc. 23(b) ...........................................................................................................12, 23, 24

Fed. R. Civ. Proc. 23(b)(3) ...........................................................................................................1, 12, 25

Fed. R. Civ. Proc. 23(c)(4) ...........................................................................................................24

Fed. R. Civ. Proc. 30(B)(6) ...........................................................................................................3, 6, 7, 20

**Regulations**

Industrial Wage Commission Wage Order 8-2001 ...........................................................................15

Cal. Code Reg., tit. 8, § 11010, subd. (2)(G) ...........................................................................20

Cal. Code Reg., tit. 8, § 11080, subd. (4)(B) ...........................................................................20

1

## **INTRODUCTION**

2   "Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*,

3   452 U.S. 89, 99 (1981).  " 'By establishing a technique whereby the claims of many individuals can be

4   resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides

5   small claimants with a method of obtaining redress for claims which would otherwise be too small to

6   warrant individual litigation.' "  *Richmond v. Dart Indus., Inc.*, 29 Cal. 3d 462, 469 (1981) (quoting *Eisen*

7   *v. Carlisle & Jacquelin*, 391 F.2d 555, 560 (2d Cir. 1968)).  This is especially true in the wage-and-hour

8   context, where California has adopted a public policy that "supports the use of class actions to enforce

9   California's [wage-and-hour laws] for the benefit of workers."  *Bradley v. Networkers Int'l, LLC*, 211 Cal.

10  App. 4th 1129, 1141 (2012); *see also Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524, 1538

11  (2008) (recognizing "it is no accident that wage and hour disputes . . . routinely proceed as class actions"

12  (internal quotation marks omitted)).

13  Here, Plaintiff John Perez ("Plaintiff") seeks to certify the following class against his employer,

14  Defendants Leprino Foods Company and Leprino Foods Dairy Products Company (collectively

15  "Leprino"), under Federal Rule of Civil Procedure 23(b)(3):

16  All non-exempt hourly workers who are currently employees, or formerly

17  have been employed, as non-exempt hourly employees at Leprino's

18  Lemoore East plant in Lemoore, California, at any time within four years

19  prior to the filing of the original complaint until resolution of this action.

20  Certification is appropriate because each of Plaintiff's theories of classwide recovery is based on

21  an alleged classwide policy or practice that directly conflicts with, or have the logical and practical effect

22  of violating, California's wage-and-hour laws.  *See Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th

23  1004, 1033 (2012) (recognizing that claims that a "uniform policy consistently applies to a group of

24  employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable

25  for class treatment").  Similarly, several of Leprino's uniform policies lack the requisite information

26  required under California law and are otherwise facially unlawful.  The Court should therefore grant

27  Plaintiff's motion and certify the class.

28  ////

1

# FACTS

**A.     Leprino is a large cheese manufacturer with a plant in Lemoore East that operates continuously.**

Leprino is the largest mozzarella cheese maker and top producer of whey protein and dairy ingredients in the world. LEPRINO FOODS: ABOUT LEPRINO FOODS, https://leprinofoods.com/about/ (last visited Nov. 22, 2019).  At issue here is Leprino's Lemoore East plant, which primarily makes mozzarella cheese for large pizza companies. Dkt. 48-2 (Ex. I) (Nicks Depo. at 66:20–67:11).  It operates 24 hours a day, 7 days a week. *Id.* at 56:21–57:1.  To facilitate its continuous operations, the plant employs over 300 people on three rotating shifts.[1]  *Id* at 46:19–47:22; *see also* LEPRINO FOODS: LEMOORE CALIFORNIA, https://leprinofoods.com/locations/lemoore-ca/ (last visited Nov. 21, 2019).

**B.     Leprino's meal and rest break policies are facially non-compliant, leading to significant violations.**

Leprino's hourly production employees at the Lemoore East plant are not subject to an employee handbook.  Rather, Leprino's policies are set forth in a collective bargaining agreement ("CBA"). Dkt. 48-2 (Ex. A); *see also id.* (Ex. I) (Nicks Depo. at 174:16–23).  This CBA applied to all hourly production employees at the plant. *Id.* (Ex. I) (Nicks Depo. at 185:18–24).  The CBA states Leprino must provide the employees 30 minutes for lunch and 10 minutes for rest periods. *Id.* at 116:9–12.  Leprino confirmed there are no other written policies specifically addressing meal or rest breaks. *Id.* at 174:12–23.  Similarly, Leprino confirmed the only way an employee would know when to take a break is by having to look at the CBA. *Id.* at 119:22–120:14.  Rather than scheduling breaks, Leprino leaves it up to the employees to decide when to take their breaks with the exception of the processing department. *Id.* at 117:9–22.

**1.     Leprino's common meal break policy is facially unlawful.**

Leprino's meal period policy is unlawful.  It states an employee may not "work through his or her second meal period if he or she works more than 10 hours and did not take a first meal period." Dkt. 48-2 (Ex. A at 23).  However, it does not require either Leprino *or* the employee to consent to waiving the right to a second meal period. *Id.*  It also does not inform employees that they cannot waive a second meal

---

[1]     *See* Dkt. 48-2 (Crist Decl., ¶ 10).

period when they work more than twelve hours, nor does it inform employees when the second meal period should be taken. *Id.* In addition, Leprino does not utilize meal waiver forms at the facility to indicate whether employees consented to waiving their breaks. Dkt. 48-2 (Ex. I) (Nicks Depo. at 194:7–21). Further, there is no ability for the employees to revoke any agreement to waive their second meal break. *Id.* at 213:8–14.

Leprino's on-duty meal period provision is also problematic. It states, "[w]here the nature of the work prevents an employee from taking an off-duty meal period, [Leprino] may schedule a shift of eight (8) continuous hours by written mutual agreement with the Union and the affected employee. In that situation, the meal period shall be considered an on-duty meal period which shall be paid time." Dkt. 48-2 (Ex. A at 23). It then lists several job positions that have "historically chosen to work through meal breaks," but offers no reason why those positions have done so. *Id.* The CBA also does not allow employees to revoke an on-duty meal period agreement after allegedly agreeing to it. *Id.*

Ultimately, Leprino's Rule 30(b)(6) witness (it's Human Resources Manager) confirmed there is nothing about the nature of the job that would require *any* employee to work through their meal periods:

> Q:     What is it about the nature of processing sanitation and cheese sanitation
>
>          that would give rise to an occasion for an employee to be working through
>
>          breaks, whether or not they chose to?
>
> A:     There is nothing about the nature of the business—or the nature of the job.

Dkt. 48-2 (Ex. I) (Nicks Depo. at 188:22–190:6); *see also id*. at 215:8–15 ("There is no position that there is the nature of the scope that would prevent someone form needing to waive their meal."). Despite this, Leprino still allows employees to work a continuous eight-hour shift without having to clock out for meal breaks. *Id.* at 200:16–201:17 (stating there is no reason employees worked through their breaks, other than because that is what Leprino has "historically" done).

**2.     Leprino's common rest break policies are also facially unlawful.**

Leprino's rest break policy does not inform employees when rest breaks should be taken. Dkt. 48-2 (Ex. A at 12); *see also id*. (Ex. I) (Nicks Depo. at 184:14–20) (admitting it "doesn't provide when they should start their rest period"). Rather, it only states that Leprino agreed to provide "rest periods of ten (10) minutes during the first half of the shift and ten (10) minutes during the second half of the shift." Dkt.

3

48-2 (Ex. A at 12).  In addition, it states that rather than receiving a second meal period, employees "will be entitled to an additional ten (10) minute rest period when they are working two (2) or more hours of overtime."  *Id*.  It also does not state rest breaks will be provided after three-and-a-half hours of work, or include any language regarding the provision of breaks "every four hours or major fraction thereof."  *Id.*

**3.  Leprino's time and payroll data show significant violations.**

Plaintiff analyzed Leprino's meal break records based on a sampling of 21,536 individual shifts. Dkt. 48-3 (Dann Decl. at ¶ 8).  Of those shifts, 21,180 were entitled to meal periods, meaning they worked *more* than six hours.  *Id*. at ¶ 9.  With this data, Plaintiff found the following:

- Approximately 7,412 shifts (or roughly 35%) did not record a meal period at all, *id*. at ¶ 10;

- Approximately 3,001 shifts (or roughly 14.1%) of all recorded meal periods were taken after the end of the fifth hour of work, *id*. at ¶ 11;

- Approximately 7,517 shifts (or roughly 35%) of all recorded meal periods were less than 30 minutes in duration, *id*. at 12.

In total, 16,152 shifts after the sixth hour of work contained at least *one* short, late, or missing first meal period.  *Id.* at ¶ 13.  That means 75% of the meal periods were short, late, or missing at the Lemoore East plant.  Of the 16,152 shifts, only 556 (or 3%) contained a paycode denoting a meal premium.  *Id.* at ¶ 14.

Plaintiff also reviewed Leprino's shifts over 10 hours to determine whether a second meal period was taken.  Of the sampling provided, it was clear Leprino rounded shifts over 10 hours down significantly.  For instance, Leprino's payroll calculation indicated 1,400 shifts were over 10 hours.  *Id*. at ¶ 17.  However, when calculating the actual punched start and end time of the shift, 2,124 shifts were over 10 hours.  *Id*.  As such, Plaintiff calculated both numbers to show a consistent failure to provide second meal periods or pay meal premiums.  Based on either number, only 1% of the shifts over 10 hours denoted a second meal period at all.  *Id.* at ¶¶ 18, 19 (only 19 meal periods were recorded based on Leprino's 1,400 calculation, and 110 were recorded for the actual time punch calculation of 2,124 shifts).  Of the 1,400 shifts from Leprino's payroll, 1,398 contained a short, late, or missing second meal period.  *Id*. at ¶ 21. Similarly, 2,122 of the 2,124 shifts based on punch times contained a short, late, or missing second meal period.  *Id*.  Lastly, of the 1,398 shifts that contained a short, late, or missing second meal, only 85 were

4

provided with a premium, *id.* at ¶ 22, and of the 2,122 shifts that contained a short, late, or missing second meal period, only 115 were provided a premium payment, *id.*

**C.**   **Leprino requires its employees to remain "on call" during meal and rest periods.**

In addition to its facially unlawful meal and rest break policies, employees are required to remain on call during meal and rest breaks and to respond to communications from supervisory personnel at all times.

**1.**   **Leprino requires workers to be constantly available to answer their supervisor's questions and follow their instructions.**

Leprino's standards of employee conduct considers "refusal to follow supervisor's instruction" grounds for "immediate dismissal." Dkt. 48-2 (Ex. F). It applied to all employees at Lemoore East. *Id.* (Ex. I) (Nicks Depo. at 241:25–242:23). It makes no exceptions for meal or rest breaks. Pursuant to this policy, supervisors regularly contact employees with work-related questions during meal and rest periods or ask them to return to the production floor.[2]

**2.**   **Workers must answer their radios, listen for their names on the intercom, respond to calls in the break room, and respond to supervisors in-person while on breaks.**

Leprino utilizes several communication methods to ensure supervisors can reach their employees at all times, even on their meal and rest breaks. Specifically, it requires employees to respond in one of several ways: via assigned radio, the breakroom phone, the breakroom intercom, or in-person.[3] For instance, foremen (hourly team leads) and maintenance personnel are required to wear radios at all times. Dkt. 48-2 (Ex. I) (Nicks Depo. at 104:2–10). They wear these radios clipped to their clothing. *Id.* at 106:12–107:5. Whenever there is an instruction given over the radio, employees are expected to answer, even during breaks. *Id.* at 232:17–22. They also do not turn them off, even for breaks.[4]

Leprino's 30(b)(6) witness also admitted there is a phone in the breakrooms, and that an employee could be called "if [that] employee was needed, was in the break room, and couldn't be located." Dkt. 48-

---

[2]   *See*, *supra*, fns. 2, 3, 5, & 6.

[3]   *See* Dkt. 48-5 (Ex. A) (Agler Decl., ¶¶ 3, 7); (Ex. B) (D. Armor Decl., ¶¶ 5, 6, 7, 12); (Ex. C) (J. Armor Decl., ¶¶ 4, 7, 8, 9); (Ex. D) (Haro Decl., ¶¶ 4, 5, 6, 7, 15); (Ex. E) (Jiminez Decl., ¶¶ 4, 5, 6, 7, 8); (Ex. F) (Laurel Decl., ¶¶ 4, 7, 8, 9); (Ex. G) (Threadgill Decl., ¶¶ 4, 5, 6).

[4]   *See* Dkt. 48-5 (Ex. A) (Agler Decl., ¶¶ 3, 7); (Ex. C) (J. Armor Decl., ¶ 4); (Ex. F) (Laurel Decl., ¶ 4).

5

2 (Ex. I) (Nicks Depo. at 156:20–158:10).   Importantly, employees are forbidden from using the breakroom phone for personal reasons.  Plaintiff himself was disciplined for using the phone for personal calls.  Dkt. 48-2 (Ex. G).  He was issued a write-up, and the Supervisor Issue Report clearly states, "the company phones should not be used for personal phone calls."  *Id.*  As such, the phones are only used for work-related purposes, and when a supervisor calls an employee in the breakroom, it's clearly for a work-related reason.

Leprino's human resources director similarly admitted employees are called by name on the intercom.  Dkt. 48-2 (Ex. I) (Nicks Depo. at 158:25–159:5).  This intercom is located on the ceiling in the breakrooms themselves.  *Id.* at 156:2–8.  Supervisors also walked into the breakroom and pulled employees back from breaks without ever paying a premium.  Dkt. 48-2 (Ex. H) (Perez Depo. at 252:25–254:2).  Being called back from a lunch break by supervisors was common, especially when something was wrong with the line.  Dkt. 48-2 (Ex. H) (Perez Depo. at 190:21–191:13).  Plaintiff estimated he was called back from a break approximately 30 to 35 percent of all shifts.[5]  *Id.* at 254:3–255:6.  However, despite these interruptions, Leprino does not pay hourly employees a premium, nor does it allow them to take another break later.[6]

Pursuant to these requirements, employees regularly stand-by to be on-call in order to assist their supervisors and return to the line.[7]  This meant people could not use their breaks for their own purposes.  Dkt. 48-2 (Ex. H) (Perez Depo. at 190:14–20); *see also* Dkt. 48-5 (Ex. F) (stating that even on the rare occasion where he left the plant, "I take my radio with me in case I am needed to answer a work related question if called upon while away from the plant").

/ / / /

/ / / /

---

[5]    Notably, this estimate matches the number of breaks that were under 30 minutes in duration based on Leprino's own time keeping and payroll records.  *See supra*, Dkt. 48-3 (Dann Decl., ¶¶ 8–13).

[6]    *See* Dkt. 48-5 (Ex. A) (Agler Decl., ¶ 6); (Ex. B) (D. Armor Decl., ¶ 13); (Ex. C) (J. Armor Decl., ¶ 11); (Ex. D) (Haro Decl., ¶ 3); (Ex. E) (Jiminez Decl., ¶ 10); (Ex. F) (Laurel Decl., ¶ 5); (Ex. G) (Threadgill Decl., ¶ 5).

[7]    *See* Dkt. 48-5 (Ex. A) (Agler Decl., ¶¶ 3, 7); (Ex. B) (D. Armor Decl., ¶¶ 5, 6, 7, 12); (Ex. C) (J. Armor Decl., ¶¶ 4, 6, 7, 8, 9); (Ex. D) (Haro Decl., ¶¶ 4, 5, 6, 7, 15); (Ex. E) (Jiminez Decl., ¶¶ 4, 5, 6, 7, 8); (Ex. F) (Laurel Decl., ¶¶ 4, 7, 8, 9); (Ex. G) (Threadgill Decl., ¶ 4, 5, 6).

6

3. **Leprino holds workers responsible for any errors that occur throughout their shift, even if they occur during a meal or rest break.**

Leprino disciplines employees when issues occur on their breaks. Plaintiff experienced this policy first-hand. During one of his breaks, his supervisor told him the "pH started to increase," and plaintiff specifically told him he was "going to get something to drink in the breakroom." Dkt. 48-2 (Ex. C). The supervisor then again told him on his break the pH level was rising and told him it's "your responsibility to stay." *Id*. When the pH crashed while on break, Mr. Perez was given an official Employee Warning Record for "Substandard Work," which told him "it was your responsibility not your supervisor's to attend to your job." *Id*. It further stated,

> John, when you are given a directive by your supervisor t [*sic*] is your responsibility to complete the task, and not leave it unattended. Had your supervisor not been there to follow through on your job, the end result would have been out-of-spec product, which could not be used and would have been discarded. Further occurrences of this type may lead to disciplinary action, up to suspension or even termination.

*Id*. When questioned about this instance, Leprino's 30(b)(6) witness said she reviewed the Supervisor Issue Report and personally wrote "Insubordination" right on the report itself. Dkt. 48-2 (Ex. I) (Nicks Depo. at 237:3–13; *see also id.* (Ex. D):

**Description of Situation**:

On Thursday 9/12/2013 John was pulling production to Ie-Nff Line #2. I discussed with John that the Cation pH will probably crash at an earlier volume. The Cation pH started to increase and John said that he was going to get something to drink in the break room. I told John that the Cation ph was starting to crash and it wouldn't be long before it was finished. He commented "I won't be long and you'll be here" and I told him that it was his responsibility that I had my own work to complete. After seeing the Cation pH increase I went back to the production floor and John wasn't there. I monitored the Cation ph until it crashed and advanced the I.E. Column to the next step to push the product out with water. John returned shortly after I had done this and he stated "Wow it crashed already good thing you were here". I asked him if I wasn't there what would have happened and he didn't respond. If the Cation ph goes past its break point spec minerals start to fall of the resins enter into the product causing the Ie-Nff to be out of spec for minerals and pH. If the Ie-Nff is out of spec it can't be used and has to be discarded. The result of this is lost time, equipment wear, waste of utilities, and extra chemicals used for regeneration.



She also clarified this was considered substandard performance because "[a]ll hourly employees are required to follow a supervisor's directive" in instances like this.  Dkt. 48-2 (Ex. I) (Nicks Depo. at 232:3–5).  She even admitted that "[i]f instructions were given via the radio . . . it['s] Leprino's expectation that the employees would have to follow it." *Id.* at 232:17–24.

> Q:   So would you agree that he was given instructions, but he didn't follow them because he wanted to go take a break, and he wasn't allowed to?
>
> A:   His document clearly states that this was substandard work.  He was given instructions to stay because the event could occur.  He was to follow those instructions, and he failed to do so.
>
> Q:   Because he was going to take a break instead.
>
> A:   **It didn't matter what he was going to do at the time.**  He failed to follow the instructions while on the floor, given face-to-face by his supervisor.

*Id.* at 234:12–235:12 (emphasis added).

## D.   Leprino requires employees to pass through a red-line room, scrub their boots, and wash their hands during their breaks.

Employees are not allowed to take their breaks on the production floor.  Dkt. 48-2 (Ex. I) (Nicks Depo. at 266:23–267:3).  As such, they must exit the production floor on all breaks and start walking to the breakroom.  *Id.* at 115:11–15.  This process takes approximately two minutes, and an additional two minutes when walking back from the break room.[8]

Anytime a production employee enters back onto the production line they also have to go through the red-line room.  Dkt. 48-2 (Ex. I) (Nicks Depo. at 268:6–18).  This includes prior to returning from meal and rest breaks.  *Id.*  To do this, employees first wait in a line to enter the red-line room.  *Id.* at 217:16–218:5 (confirming Leprino expects them to go through the red-line room "one after another").  Within the red-line room, employees first scrub their boots, and then wash their hands.  *Id.* at 83:18–20, 217:9–12.  Leprino's Good Manufacturing Practice Agreement states employees *must* "wash[] and sanitiz[e] hands thoroughly before work, [and] after each absence from [their] work station."  Dkt. 48-2

---

[8]   *See* Dkt. 48-5 (Ex. C) (J. Armor Decl., ¶ 12); (Ex. D) (Haro Decl., ¶¶ 4, 5, 6, 7, 15); (Ex. E) (Jiminez Decl., ¶¶ 4, 5, 6, 7, 8); (Ex. F) (Laurel Decl., ¶¶ 4, 7, 8, 9); (Ex. G) (Threadgill Decl., ¶ 4, 5, 6).

8

(Ex. B). All this must be done prior to heading back to the production floor where the time clocks are located. *Id.* (Ex. I) (Nicks Depo. at 114:3–5).

Leprino's human resources manager confirmed the boot-cleaning process takes at least 50 seconds per person. *Id.* (Ex. I) (Nicks Depo. at 82:3–10). From there, washing hands takes up to a minute-and-a-half per person because employees have to rinse their hands, pump the sanitization spray, and then dry them. *Id.* at 270:10–22. Leprino requires them to wash their hands individually. *Id.* at 81:4–9. Only then may employees proceed to clock-in on their way to the production floor.

## E.   **Leprino requires its employees to don and doff prior to clocking-in, and after clocking out in excess of 14 minutes.**

Leprino does not dispute that employees perform work prior to clocking-in. For instance, employees first enter a key code to gain access to the singular parking lot. Dkt. 48-2 (Ex. I) (Nicks Depo. at 71:18–72:8). After parking, the employees all proceed to their locker room through the plant entrances, which takes up to two minutes. *Id.* at 89:1–22. They then enter through either one of two entrances on the North or South end of the plant. *Id.* at 68:23–69:18. Regardless of the entrance, it takes 30 to 40 seconds to get from the entrance to the locker room. *Id.* at 91:6–20. There, they put on the company uniform, which consists of a Leprino shirt, pants, boots, a hard hat, and a tool belt. *Id.* (Ex. H) (Perez Depo. at 170:6–11; *see also id.* (Ex. I) *(*Nicks Depo. at 72:20–74:7). This process takes several minutes because the shirt is a button-up on both sleeves and had to be tucked in.[9] *Id.* (Ex. H) (Perez Depo. at 156:6–157:20). Leprino's 30(b)(6) witness also admitted the uniform changing process takes at least two to three minutes. *Id.* (Ex. I) (Nicks Depo. at 74:8–10). The employees then line-up by the time clock because they are not allowed to clock-in until exactly seven minutes prior to their official start time. *Id.* (Ex. H) (Perez Depo. at 159:2–24); *see also id.* (Ex. E). Finally, it takes another two minutes to clock-in because the clock-in system uses a fingerprint scanner, which employees must use individually. *Id.* (Ex. H) (Perez Depo. at 167:5–18).

In total, employees estimate it takes them approximately 10 minutes to complete all of their duties *prior to* clocking in seven minutes before the start of their official shifts. See Dkt. 48-5 (Ex. C) (J. Armor

---

[9]   See Dkt. 48-5 (Ex. C) (J. Armor Decl., ¶ 12); *id.* (Ex. D) (Haro Decl., ¶ 9); *id.* (Ex. F) (Laurel Decl., ¶ 11); *id.* (Ex. G) (Threadgill Decl., ¶ 10).

Decl., ¶ 12); *id.* (Ex. D) (Haro Decl., ¶ 9); *id.* (Ex. F) (Laurel Decl., ¶ 11); *id.* (Ex. G) (Threadgill Decl., ¶ 10). After clocking in, employees all go through the redline room to scrub their boots and wash their hands, walk upstairs to attend the pre-shift meetings, put on any additional equipment, and finally head to the production floor. Dkt. 48-2 (Ex. I) (Nicks Depo. at 76:15–23). This process takes another 10 minutes or more *after* the employees clock-in. Dkt. 48-2 (Ex. I) (Nicks Depo. at 245:13–246:19) (admitting it takes employees at least 10 minutes go through the process of putting on additional gear and walking upstairs to the pre-shift room "after clock-in time"). As such, the entire process of pre-clock in duties and post-clock-in donning and doffing requirements takes at least twenty minutes each time.

Employees' post-clock-out duties are very similar with one additional requirement prior to being able to clock-out. Leprino requires employees to *wait* until their relief worker is actually on the production floor before they can clock-out. Dkt. 48-2 (Ex. H) (Perez Depo. at 177:14–6). As such, employees must wait for the incoming shift to change into their uniforms, clock-in, go through the redline room to wash their hands and scrub their boots, attend a pre-shift meeting, put on protective equipment, walk back downstairs, and then get to the production floor. Dkt. 48-2 (Ex. I) (Nicks Depo. at 76:15–23). As such, employees do not start the clock-out process until *after* the official end of their shift. Once they are relieved, employees can finally clock-out, head to their personal lockers, take off the uniforms, put the uniforms in a dirty laundry bin, take off their tool belts and hard hats, place them in the personal locker, and take off their boots before heading to their cars. *Id.* (Ex. H) (Perez Depo. at 177:24–178:25). Leprino also does not dispute this.

> Q:      Well, do they take off the clothes and then clock out at the end of the day, or do they clock out first and then take off their clothes?
>
> A.      They clock out first and then take off their clothes.

Dkt. 48-2 (Ex. I) (Nicks Depo. at 182:11–15).

Leprino's CBA provides for 14 minutes of additional pay purportedly for donning and doffing for its pre- and post-shift work. Dkt. 48-2 (Ex. A). This time is meant to compensate *both* pre-shift and post-shift donning and doffing for putting on uniforms. Dkt. 48-2 (Ex. I) (Nicks Depo. at 83:4–12, 181:9–182:10). These 14 minutes are added automatically to each employee's paystubs for each shift. *Id.* at 253:23–254:21. However, these 14 additional minutes are added to the employee's *paid* time, and is not

based on their actual *punch* time.  *Id.*  This is critically important because of Leprino's rounding policy, which allows for 14 minutes of rounding time for pre- and post-shift work.  For example, employees are instructed they can clock-in, *no earlier* "than 7 minutes prior to shift starting time" (*i.e.*, employees may punch in at 7:53 a.m., but the punch time is rounded to 8:00 a.m. for payroll purposes).  Dkt. 48-2 (Ex. E).  The opposite scenario happens at the end of the day, meaning employees can clock out no later than 7 minutes *after* the end of their shifts.  *See id.* (Ex. I) (Nicks Depo. at 248:9–249:6).  That is, when an employee clocks out within seven minutes of their shift ending, it rounds back (*i.e.*, a 5:07 p.m. punch-out time becomes a 5:00 p.m. punch-out time for purposes of payroll).  *Id.*

In total, this policy allows 14 minutes of rounded time per day.  This appears to be how Leprino calculated its 14 minute pay for donning and doffing.  Because the additional 14 minutes are paid *after* the rounding occurs, any additional time spent pre- and post-clock in in excess of 14 minutes goes entirely unpaid.  And, because employees spend at *least* 20 minutes on pre- and post-shift donning and doffing duties,[10] this does not cover all the time spent on these indispensable duties.

This Court has already analyzed the CBA's "14 minute" provision.  *See* Dkt. 24.  It held if "the putative class members regularly spend more than fourteen minutes donning and doffing sanitary gear, they could recover for underpayment of that time."  *Id.*  "Plaintiff has alleged facts that, if true, could just as easily support liability as an absence of liability."  *Id.*  "The pre and post-shift activities that Plaintiff alleges are appropriately classified as "hours worked" under California law."  Dkt. 24 at 7.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 provides that " '[a] class action may be maintained if two conditions are met:  The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b).' "  *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (alteration in original) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).

---

[10]   *See supra* at 9:25–10:8.

11

Rule 23 is not "a mere pleading standard," so establishing its requirements sometimes requires evidence, which courts must subject to a " 'rigorous analysis.' " *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). While such rigor "may 'entail some overlap with the merits of the plaintiff's underlying claim,' " the likelihood of overlap is "no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (quoting *Wal-Mart*, 131 S. Ct. at 2551)). This is because "[t]he certification question is 'essentially a procedural one,' " that examines "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 326, 327 (2004) (quoting *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 439–40 (2000)).

Finally, courts "retain[ ] the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). Therefore, any " 'doubts regarding the propriety of class certification should be resolved in favor of certification.' " *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 299–300 (C.D. Cal. 2012) (quoting *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)).

## **ARGUMENT**

### I.    ALL FOUR RULE 23(A) PREREQUISITES ARE MET.

All of Rule 23(a)'s prerequisites are satisfied, and the proposed class meets the requirements of Rule 23(b)(3). The class should be certified.

#### A.    The class is sufficiently numerous to make joinder impracticable.

Numerosity requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, the plaintiff does not need to demonstrate the exact number of class members, nor is there a particular magic number that is required. *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). Nevertheless, "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *See* William Rubenstein et

12

al., Newberg on Class Actions § 3:12 (5th ed. 2011).  Here, the proposed class consists of at least 300 or more production workers, *see, supra*, fn. 1, so numerosity is easily satisfied.

### B.     There are common questions that will drive the resolution of the litigation.

Commonality requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  " 'All questions of fact and law need not be common to satisfy [this requirement].  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.' "  *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).  Simply put, commonality "is more qualitative than quantitative."  1 Rubenstein et al., *supra*, § 3:20.  "Even a single common question will do."  *Wal-Mart*, 131 S. Ct. at 2556 (alterations and internal quotations marks omitted); *accord Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (" 'So long as there is "even a single common question," a would-be class can satisfy the commonality requirement of Rule 23(a)(2).' " (quoting *Wang*, 737 F.3d at 544)).

The common question must, however, "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.  Put differently, commonality focuses on whether the answer to a common question will " 'drive the resolution of the litigation.' "  *Id.* (emphasis omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  Therefore, "[t]hough common issues need not be 'dispositive of the litigation,' they must 'present a significant aspect of the case [that] can be resolved for all members of the class in a single adjudication' so as to justify 'handling the dispute on a representative rather than an individual basis.' "  *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 537 (N.D. Cal. 2012) (second alteration in original) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001) and *Hanlon*, 150 F.3d at 1022); *accord* Am. Law Inst., *Principles of Law of Aggregate Litigation* § 2.01 (2009) ("Common issues are those legal or factual issues that are the same in functional content . . . regardless of whether their disposition would resolve all contested issues in the litigation.").

"Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d

13

1161, 1165 (9th Cir. 2014) (citing *Parsons*, 754 F.3d at 676).   Therefore, to determine whether commonality is satisfied, the Court should examine the elements of Plaintiff's claims and determine whether the common questions related to Plaintiff's theory of classwide recovery will "drive the resolution" of those claims.   *See e.g., id.* at 1165–66 (comparing the common questions to the elements of an off-the-clock claim); *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 958–63 (9th Cir. 2013) (comparing common questions to the elements of California's "nature of the work" exception).

### 1.     Common questions will drive the resolution of Plaintiff's meal and rest break claims regarding the compliance of its uniform policies.

California law "obligates employers to afford their nonexempt employees meal periods and rest periods during the workday." *Brinker*, 53 Cal. 4th at 1018 (citing Cal. Lab. Code §§ 226.7, 512).   An employer's responsibilities are the same for both types of breaks. *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 265 (2016).   They "must 'relieve the employee of all duty and relinquish any employer control over the employee and how he or she spends the time.' " *Id.* (quoting *Brinker*, 53 Cal. 4th at 1038–39).

Here, Plaintiff's first theory of recovery for their meal period and rest break claim is that Leprino's uniform meal period and rest break policies are unlawful under the Labor Code.   For instance, California law requires employers to provide a second 30-minute meal period if the employee works more than 10 hours per day.   *See* Lab. Code § 512.   Employees may waive the right to a second meal period, but only if they do not work more than 12 hours, and they have not waived their first meal period.   *Id.*   However, Leprino's meal period policy entirely fails to inform employees that they cannot waive their right to a second meal period if they work over 12 hours.   Dkt 48-2 (Ex. A).   Similarly, it does not inform employees when the second break must occur, as required by *Brinker*.   *Brinker*, 53 Cal.4th at 1041 (holding that, absent waiver, employers are required to provide "a second meal period no later than the end of the employee's 10th hour of work").   Concerning rest breaks, Leprino's policy fails to state when production worker' breaks should be taken, fails to state they must be provided every four-hour period or "major fraction thereof," and fails to state they should be taken in the middle of the work period "insofar as practicable." *Compare* Dkt. 48-2 (Ex. A) *with* Wage Order 8-2001, § 12(A).

14

As a result of these policies—and the lack of proper training—they received noncompliant meal periods in a whopping 75% of all shifts. Ex. 48-3 (Dann Decl., ¶ 13). Of those violations, Leprino paid a meal premium only 3% of the time. *Id.*, ¶ 14.

These types of claims are the "sort routinely, and properly, found suitable for class treatment." *Brinker*, at 1033. "The theory of liability—that [Leprino] has a uniform policy and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment. *Id.*; see also *In re Taco Bell Wage and Hour Actions*, No. 1:07cv1314 LJO DLB, 2012 WL 5932833, at *5 (E.D.Cal. 2012) ("Numerous courts within the Ninth Circuit have held that commonality exists where a defendant's policy allegedly violates the meal requirements of California law.").

For example, in *Albert v. Aurora Behavioral Health Care*, 241 Cal.App.4th 388 (2015) the plaintiffs "dispute[d] the 'facial legality of the [employer's] break policies." *Albert*, 241 Cal.App.4th at 405. The meal period policy stated, "employees [were] entitled to 'an unpaid thirty minute break for a meal period, approximately half way between the beginning and ending of the employee's shift.' California law, however, requires that a meal period be provided during the first five hours of an employee's shift." *Id.* (citing *Brinker*, 53 Cal.4th at 1048–49). The plaintiffs also "submitted substantial evidence that, on those occasions when nursing staff were able to take a meal break, the break was almost always not taken during the first five hours of their shift." *Id.* They also "submitted evidence showing that [the employer's] policy does not provide for a second meal break, and staff are routinely not provided a second 30-minute meal break in shifts over 10 hours." *Id.* at 405–6. Concerning rest breaks, the employer's policy did "not require that rest breaks be provided for each four hours worked, or "major fraction" thereof, and d[id] not provide for a third rest break in shifts exceeding 10 hours." *Id.* (citing *Brinker*, at 1032–33). Accordingly, the court held that certification was appropriate under *Brinker*, and reversed the trial court's denial of class certification. *Id.*; *see also, e.g.*, *Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701, 726 (2013) (finding that plaintiff's theory of liability, namely that "[the defendant] violated wage and hour requirements by failing to adopt a policy authorizing and permitting meal and rest breaks to its technicians" was amenable to class treatment); *Faulkinbury v. Boyd Associates*, 216 Cal.App.4th 237 (reversing trial court's denial of certification of a

15

class alleging rest break violations, holding that class-wide issues predominated because "[the defendant's] liability, if any, would arise upon a finding that its uniform rest break policy, or lack of policy, was unlawful"); *Bradley*, *supra*, 211 Cal.App.4th at 1149–54 ("Here, plaintiffs' theory of recovery is based on [the defendant's] (uniform) lack of a rest and meal break policy and its (uniform) failure to authorize employees to take statutorily required rest and meal breaks.  The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof."); *Safeway, Inc. v. Superior Court of Los Angeles County*, 238 Cal.App.4th 1138, 1159 (2015)  [explaining certification "does *not* require a showing that all—or virtually all—class members accrued unpaid meal break premium wages, but only that on a system-wide basis, petitioners denied the class members [premium pay]."]; *Jaimez v. DAIOHS USA, Inc.* 181 Cal.App.4th 1286, 1304 (2010)  (reversing denial of class certification because the trial court should have relied on the employees' common evidence that their delivery schedules made it difficult for them to take all of their required breaks and complete their deliveries within eight hours and many drivers testified that they did not take their breaks).  Accordingly, common questions predominate on Plaintiff's first theory of recovery for his meal period and rest break claims.

Plaintiff's second theory is that Leprino's policies and practices required employees to remain on-call during breaks, conflicting with *Brinker*.  In *Augustus v. AMB Security Services, Inc.*, the California Supreme Court recently held that this requirement is *not* satisfied if an employer requires its employees to remain on-call during breaks.

> Employees forced to remain on call during a [meal or] rest period must fulfill certain duties:  carrying a device or otherwise making arrangements so the employer can reach the employee during a break, responding when the employer seeks contact with the employee, and performing other work if the employer so requests.  These obligations are irreconcilable with employees' retention of freedom to use [meal and] rest periods for their own purposes.

*Id.* at 270 (citing *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585 (2000)).  Employers who fail to provide duty free breaks must pay the employee "one additional hour of pay at the employee's regular rate

of compensation for each workday that the meal or rest period [was] not provided," which is called premium pay.  Cal. Lab. Code § 226.7.

Here, Plaintiff's theory of classwide recovery for his meal and rest break claims is that Leprino requires the production workers at the Lemoore East plant to remain on-call during their breaks.  This theory is supported by Leprino's common policies, several undisputed facts, and the testimony of class members.  For example, many of Leprino's polices instruct them to always answer their supervisor's questions and follow their instructions, with no exceptions made for breaks.  *See supra* at 5:7–13.  Many workers are also assigned radios and are told they must carry it with them at all times, including their breaks.  *See supra* at 5:14–22.  Leprino also installed an intercom and telephone in the breakroom so workers could communicate with the floor while on break.  *See supra* at 5:23–6:15.  When breaks are interrupted, Leprino does not pay premium pay or allow workers to restart their break.  *See supra* at 6:13–15.  The testimony of the production workers confirm that these policies and facts have created a culture of on-call breaks.  They confirm they are required to answer their radios, listen for their names on the intercoms, respond to calls in the break room, and respond to supervisors during their breaks.  *See supra* fns. 3, 5, 6, 7.  Workers are also disciplined, suspended, or even terminated if they fail to respond to questions or return to work when asked.  *See supra* at 7:1–8:13.

This "theory of liability—that [Leprino] has a uniform policy and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." *Brinker*, 53 Cal.4th at 1041; *accord Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) ("[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.").  At trial, the fact-finder merely needs to examine Leprino's common policies, the undisputed facts, and the class member testimony and determine whether Leprino had a practice of providing on-call breaks.  Indeed, courts frequently certify cases based on similar common facts.

For example, in *Ayala v. U.S. Xpress Enterprises Inc.*, No. EDCV 16-137-GW(KKx), 2017 WL 3328087, at *10 (C.D. Cal. July 27, 2017), the plaintiff presented class member testimony "that [their employer] require[d] [them] to shoulder the affirmative responsibilities of securing their loads and responding to system alerts at all times," including breaks.  He therefore argued that this amounted to

"illegal 'on-call' breaks," and sought certification. *Id.* The employer responded by presenting testimony that "some [employees] dispute[d] whether or not [the employer] required them to perform these tasks." *Id.* The court found commonality (and predominance) satisfied. *Id.* It explained "liability will turn on whether 'securing the load' and responding to alerts messages rises to the level of employee control that would turn any break periods provided into impermissible on call breaks." *Id.* "While the details of the individual [employees'] experiences may inform this inquiry, whether or not individual class members actually performed these tasks is secondary to whether [the employer's] policies placed the type of affirmative burden prohibited by *Augustus.*" *Id.*

Similarly, in *Antemate v. Estenson Logistics, LLC*, No. CV 14–5255 DSF (RZx), 2015 WL 3822267, at *2 (C.D. Cal. June 15, 2015), the plaintiff sought to certify a meal and rest break class based on his claim that his employer's "informal policies and practices create[d] an environment in which [employees] are routinely pressured not to take compliant breaks." In finding commonality, the court recognized that, "[e]ven assuming that individual questions will inevitably arise, [the plaintiff's] theory of liability—supported by multiple declarations and depositions—presents questions of law and fact common to the class. [The employer] either does or does not maintain these allegedly uniform policies and practices; if it does, a common legal question arises concerning whether this conduct violates California meal and rest break requirements." *Id.* at *3.

And in *Campbell v. Vitran Express Inc.*, the plaintiffs alleged their employer "implemented an unofficial policy of discouraging and denying its [employees] meal and rest breaks." 2015 WL 7176110 at *1. For common proof, plaintiffs submitted declarations stating their employer did not provide them with breaks, falsified their time records, and "issued premium pay for missed meal breaks on less than five occasions." *Id.* at *7. Relying on this evidence, the court concluded there was "common questions of law and fact arising from [the employer's] alleged practice of violating California labor law and unfair competition laws relating to meal and rest breaks." *Id.* at *4. The employees' "claims stem from the same source in that they were all employed . . . during the relevant class period, and they were all subject to the same unofficial policy." *Id.*; *see also e.g., Brewer v. Gen. Nutrition Corp.*, 11-CV-3587 YGR, 2014 WL 5877695, at *6–*8 (N.D. Cal. Nov. 12, 2014) (finding commonality and predominance based evidence their employer did not schedule breaks, time records showing "meal period violations occur[red] in about

18

one third of shifts," "rest break violations occur[red] in about 80% of shifts," and their employer never made any premium payments for missed breaks); *Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1304–05 (2010) (finding commonality and predominance based on evidence that scheduling policy and workload "made it extremely difficult" for employees to both timely complete their work and take all required breaks and there was no evidence that premium pay was ever paid); *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 635–39 (S.D. Cal. 2010) (finding commonality and predominance where the employer " 'regularly emphasized that breaks were not to be taken until' " the work was done, failed to schedule meal periods into shifts, and "never paid a premium wage for a missed break"); *Cervantez v. Celestica Corp.*, 253 F.R.D. 562, 573 (C.D. Cal. Jul. 30, 2008) ("[E]vidence that no premium was paid for missed meal periods, combined with testimony that class members did miss meal periods when they worked more than ten hours and statistical evidence that class members worked more than ten hours in thousands of instances, is enough to show a 'common core of salient facts.' ").

Plaintiff's final theory of recovery for his meal period and rest break claim is that Leprino's uniform policies require production workers to exit the production floor, pass through the redline room, scrub their boots, and wash their hands during their meal and rest breaks, depriving them of the uninterrupted 30-minute meal period and 10-minute rest breaks they are entitled to. *See supra* at 8:14– 9:7. Under California law, the key to proving unpaid wages is the degree of the employer's control. There is no dispute that time spent under the control of an employer is deemed compensable as a matter of law. *See Morillion v. Royal Packing Co.,* 22 Cal.4th 575, 588–94 (2000). There is also no dispute production employees must walk to the breakroom and pass through the redline room prior to returning from their breaks. *Id.* This common question can be determined as a matter of law. If the Court finds the time cutting into their breaks compensable, damages can be determined through the use of time study experts to determine the reasonable amount of time it would take an employee to complete these tasks.

### 2.      Common questions will drive the resolution of Plaintiff's "on duty" meal period claim.

"An 'on-duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement the parties an on-the-job paid

19

meal period is agreed to.  The written agreement shall state that the employee may, in writing, revoke the agreement at any time."  *Brinker*, 53 Cal.4th at 1035.  The right to revoke language is mandatory in all on-duty meal period agreements.  *Naranjo v. Spectrum Sec. Servs., Inc.*, 40 Cal. App. 5th 444, 460 (Ct. App. 2019).  Without this language, the employer becomes liable for the entire class to which the provision governed.  *Id.* at 463.  Proof of causation and harm are unnecessary, and the requirement to pay a meal period premium is "automatic."  *Id.*  This mandatory language is absent from Leprino's sole meal break policy, which applied to all hourly employees.  Dkt. 48-2 (Ex. A).  As such, Leprino is automatically liable to pay a meal premium for each instance a class member was entitled to a meal period.

In addition, an employer who opts to implement on-duty meal periods carries the burden of establishing that the facts justify an on-duty meal period, meaning the nature of the work prevents them from being relieved of all duty.  *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 961 (9th Cir. Cal. 2013); *see also Dynabursky v. AlliedBarton Sec. Servs. LP*, No. 812CV2210JLSRNBX, 2014 WL 12690698, at *4 (C.D. Cal. Jan. 29, 2014).   But Leprino's 30(b)(6) witness confirmed there is no reason whatsoever for *any* position not to be relieved from a meal period, and that there is nothing about the nature of the work or the job that would require its employee to remain on call.   Accordingly, the class should be certified.

### 3.     Common questions predominate on Plaintiff's theory that Leprino fails to compensate its employees for required pre- and post-shift work in excess of 14 minutes.

Employers are required to pay their employees for "all hours worked."  Cal. Code Reg., tit. 8, § 11080, subd. (4)(B); accord, *Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1044 (C.D. Cal. 2011) ("California law does not permit *any* time to be uncompensated.").   "Hours worked" is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  Cal. Code Reg., tit. 8, § 11010, subd. (2)(G).   An employer that fails to pay its employees for all hours worked, including straight time, is subject to liability.  *See* Lab. Code, § 1194, subd. (a).

Here, Plaintiff's theory of recovery for his off-the-clock claims is that Leprino maintained several uniform policies and practices that had the practical effect of forcing its production workers to perform an excess of 14 minutes of work before clocking-in for each shift and after clocking-out when

20

their shifts ended.  For example, after using a key-code to gain access to the site, Leprino's employees head to a singular parking lot.  *See supra* 9:8–11:18.  From there, they are required to use one of two entrances to gain access to the plant.  *Id*.  After entering the building, they enter their designated locker rooms and have to put on a company uniform, including a button-down shirt, pants, tool belt, and hardhat.  *Id*.  Leprino does not dispute these employees must perform these duties prior to clocking-in, or that it takes several minutes prior to them being allowed to do so.  *Id*.  Likewise, Leprino does not allow employees to remove this clothing until *after* they have already clocked-out for the day, which takes just as long.  *Id.*  Worse still, Leprino does not allow employees to even start the clocking-out process until their relief arrives and has passed through its pre-shift procedures.  *Id.*  There is also no dispute these requirements applied to *all* production employees.

This issue is compounded by Leprino's uniform rounding system, which allows employees to clock-in up to seven minutes *prior* to the start of their shift and seven minutes *after* the end of their shifts, resulting in a maximum of 14 minutes rounded for the benefit of Leprino.[11]  To compensate for this, Leprino provides a flat 14 minutes of pay at each employee's regular rate of pay, which is tacked onto the employee's scheduled shift.  *Id*.  Accordingly, it does not add an additional 14 minutes to when an employee *actually* punches in.  So, if an employee performs *any* of their required pre- or post-clock-in duties in excess of those 14 minutes, the employee is not paid whatsoever.  *Id*.

As this Court has already determined, if "the putative class members regularly spend more than fourteen minutes donning and doffing sanitary gear, they could recover for underpayment of that time." Dkt. 24.  "Plaintiff has alleged facts that, if true, could just as easily support liability as an absence of liability."  *Id.*  "The pre and post-shift activities that Plaintiff alleges are appropriately classified as "hours worked" under California law."  *Id.*  Since these claims will rise or fall based on Leprino's uniform policies, common questions predominate.  Damages can be determined through the use of time study experts to determine the reasonable amount of time it would take an employee to complete these tasks.

////

////

---

[11]   *See's Candy Shops, Inc. v. Superior Court*, 210 Cal.App.4th 889, 902 (2012) (explaining "an employer's rounding policy violates the DOL rounding regulation if it 'systematically undercompensate[s] employees' ") (alterations in original).

21

1

### 4.    Plaintiff's remaining claims are derivative.

2        Plaintiff's remaining claims for failure to provide accurate wage statements, waiting time penalties,

3    and unfair competition law are derivative of Plaintiff's other claims.   Accordingly, if Plaintiff's other

4    claims are certified, then these claims should be certified as well.   *See Bradley*, 211 Cal. App. 4th at 1156

5    (holding the plaintiff's claims for "(1) failure to furnish accurate wage statements; (2) failure to keep

6    accurate payroll records; (3) waiting time penalties; and (4) unfair business practices" were derivative of

7    the plaintiff's other claims and therefore should also be certified); *Boyd v. Bank of Am. Corp.*, 300 F.R.D.

8    431, 442 (C.D. Cal. 2014) (same; also including "late pay and waiting time penalties").

9    ### C.    Plaintiff's claims are typical of the claims and defenses of the class.

10        Typicality requires "the claims or defenses of the representative parties [be] typical of the claims or

11    defenses of the class." Fed. R. Civ. P. 23(a)(3).   "Although the 'commonality and typicality requirements .

12    . . tend to merge,' each factor serves a discrete purpose.   Commonality examines the relationship of facts

13    and legal issues common to the class members, while typicality focuses on the relationship of facts and

14    issues between the class and its representatives." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 613 n.37

15    (9th Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 2541 (2011).   In other words, typicality tests whether

16    the other members of the class " 'have the same or similar injury, whether the action is based on conduct

17    which is not unique to the named plaintiffs, and whether other class members have been injured by the

18    same course of conduct.' " *Parsons*, 754 F.3d at 685 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d

19    497, 508 (9th Cir. 1992)).   Here, Plaintiff's claims arise out of the same course of conduct—i.e., the

20    alleged on-call breaks, facially invalid policies, and off-the-clock work—as the other class members.

21    Typicality is satisfied.

22    ### D.    Plaintiff and his counsel are adequate.

23        Adequacy of representation requires that "the representative parties will fairly and adequately

24    protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).   "To determine whether the representation

25    meets this standard, [courts] ask two questions:  (1) Do the representative plaintiffs and their counsel have

26    any conflicts of interest with other class members, and (2) will the representative plaintiffs and their

27    counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957

28    (9th Cir. 2003).  Here, there are no conflicts between Plaintiff and the class.  Dkts. 48-4 & 48-6.  Plaintiff

also understands his role in this case, *id.*, and has hired experienced counsel who will fairly, responsibly, and vigorously represent the interests of the class, *id.* Adequacy is therefore satisfied.

## II.   RULE 23(B)(3) IS SATISFIED.

Since the four prerequisites of Rule 23(a) are satisfied, Plaintiff need only demonstrate his proposed class fits into one of three categories described in Rule 23(b). *Bateman*, 623 F.3d at 712. Here, Plaintiff seeks certification under (b)(3), which has two requirements:   (1) predominance and (2) superiority. *See* Fed. R. Civ. P. 23(b)(3). Both are satisfied.

### A.   Common questions predominate over any purported individualized issues.

Predominance requires the "questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This requires courts to " 'focus[ ] on "the relationship between common and individual issues" in the case' and test[ ] whether the proposed class is ' "sufficiently cohesive to warrant adjudication by representation." ' " *Abdullah*, 731 F.3d at 964 (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013)). Therefore, by its own terms, predominance does not require a plaintiff to " 'establish that there are no individualized issues, only that the class issues predominate.' " *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 594 (D. Or. 2013) (quoting *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 559 (D. Or. 2009)).

District courts engage in this analysis by "compar[ing] the issues subject to common proof against the issues subject solely to individualized proof." 1 William Rubenstein et al., *supra*, § 4:50; *accord Sav-on*, 34 Cal. 4th at 334 ("Predominance is a comparative concept . . . ."). This comparison is "more than just count[ing] up common issues and individual issues." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 470 (N.D. Cal. 2014); *accord Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (recognizing the predominance inquiry is not "bean counting"). Rather, "the inquiry is pragmatic and qualitative and focuses on whether common questions present the overriding issues in a suit." *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 308 (N.D. Cal. 2015); *accord Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 559 (D. Idaho 2010) ("Predominance is determined not by counting the number of common issues, but by weighing their significance."). So, " '[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication,' " predominance is satisfied because " 'there is clear justification for handling the dispute on a representative rather than on an

23

individual basis.' " *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1778 (2d ed. 1986)).   Conversely, when " 'the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues,' " class treatment becomes inappropriate.   *Cooper v. S. Co.*, 390 F.3d 695, 722 (11th Cir. 2004) (alterations in original) (quoting *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

  Notably, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b) (3)," especially in a wage-and-hour case.   *Levya v. Medline Indus., Inc.* 716 F.3d 510, 514 (9th Cir. 2013); *see also Wal-Mart*, 131 S.Ct. at 2558 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)").   "[D]amages determinations are individual in nearly all wage-and-hour class actions," and therefore any rule precluding certification " 'on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.' "   *Levya*, 716 F.3d at 513–14 (quoting *Brinker*, 53 Cal. 4th at 354).   Indeed, courts regularly certify "issue" classes under Rule 23(c)(4) "to separate the issue of liability from damages." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *see also* Fed. R. Civ. P. 23(c)(4) advisory committee notes (noting, as an example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims").

  Here, there are no individual issues for any of Plaintiff's classwide claims—let alone an individual issue that could predominate over the identified common questions.   All classes here are "entirely cohesive:  [They] will prevail or fall in unison.  In no event will the individual circumstances of particular [subclass] members bear on the inquiry."   *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).   Take, for example, Plaintiff's claim that the production workers were on-call during their meal and rest breaks.  If the breaks were on-call, then *all* the class members' claims prevail.  If it was not, then they *all* lose.  The same is true for the validity of its meal and rest break policy, and the requirements to perform pre- and post-shift duties without pay.  If the policy and practices are unlawful, then *all* the class members' claims prevail.  If not, they all lose.  In no situation would the Court need to look to the individual experiences of each class member to determine classwide liability.

////

24

**B.     Class treatment is superior to litigating more than hundreds of individual cases.**

Superiority requires the plaintiff to demonstrate that class treatment "is superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3). " '[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy.' " *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1779 (3d ed. 2005)). A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Courts have widely recognized that class actions alleging an employer systematically violated California's wage-and-hour laws are particularly well-suited for class treatment. *See Bradley*, 211 Cal. App. 4th at 1141 ("This state's public policy supports the use of class actions to enforce California's [wage-and-hour] laws for the benefit of workers.").

Here, because common questions of law and fact predominate, judicial economy and the parties' resources will be furthered by class treatment. As explained above, classwide liability can be established by adjudicating Plaintiff's common questions, and these common questions predominate over any purported individualized issues. Therefore, rather than conducting over hundreds of individual mini-trials for each production worker, it makes more sense to prove the elements of liability through common proof. Class treatment is clearly superior.

### CONCLUSION

As explained above, Plaintiff has satisfied the procedural requirements for certification under Federal Rule of Civil Procedure 23. The Court should therefore grant Plaintiff's motion and certify the class.

Date:  November 22, 2019                    **PARRIS LAW FIRM**

By:___/s/ *Ryan A. Crist*_____
        R. Rex Parris
        Kitty K. Szeto
        John M. Bickford
        Ryan A. Crist

        Attorneys for Plaintiff
        And the Putative Class