1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOHN PEREZ, on behalf of himself and on behalf of all other similarly situated individuals,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LEPRINO FOODS COMPANY, a Colorado Corporation; LEPRINO FOODS DAIRY PRODUCTS COMPANY, a Colorado Corporation; and DOES 1–50, inclusive,**<br><br>**Defendants.** | **CASE NO. 1:17-cv-00686-AWI-BAM**<br><br>**ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>(Doc. No. 48) |

17    In this class action lawsuit, John Perez is suing two cheese manufacturing companies,

18 Leprino Foods Company and Leprino Foods Dairy Products Company.[1]  Perez is a former Leprino

19 employee.  Broadly, Perez alleges that Leprino violated California wage-and-hour laws by (1) not

20 paying employees minimum wages for all hours worked; (2) not providing employees with legally

21 compliant meal and rest periods; and (3) based on these violations, not paying employees

22 separation wages or providing them with accurate wage statements, and engaging in unfair

23 competition practices.  Perez now moves for class certification under Federal Rule of Civil

24 Procedure 23(b)(3).  Having reviewed and considered all the briefing and evidence submitted by

25
26

27 ───────────────

[1] In their class certification briefing, the parties, including both Defendants (responding as one), make no distinction
28 between the Leprino entities.  Rather, the parties treat both Defendants as if they are a single "Leprino" entity.  The
Court will adopt that practice in this order.

1 | the parties, the Court will grant in part and deny in part Perez's motion.[2]

2

3 | **BACKGROUND**

4 |  Leprino manufactures and processes cheese and dairy ingredients at its Lemoore East

5 | facility in Lemoore, California.  Lemoore East, which is one of several Leprino facilities in the

6 | State of California, generally operates twenty-four hours a day, seven days a week, and has

7 | approximately 140 nonexempt, hourly employee positions, for which Leprino employs about 263

8 | individuals to fill.  Nearly all of the nonexempt, hourly employees at the Lemoore East facility are

9 | represented by Creamery Employees and Drivers Union, Teamsters Local No. 517.  Leprino and

10 | the Union negotiate and execute a collective bargaining agreement ("CBA") that details the terms

11 | and conditions of employment at Lemoore East for all Union-represented workers.  This includes

12 | terms and conditions regarding pay, meal periods, and rest periods.

13 |  Perez filed his lawsuit on April 13, 2017.  Doc. No. 1.  In his second-amended complaint,

14 | Perez raises the following claims on behalf of himself and all similarly situated putative class

15 | members:  (1) failure to pay minimum wages, Cal. Labor Code §§ 510, 558, 1194, and 1198,

16 | California Industrial Welfare Commission Wage Order 8-2001 ("Wage Order 8"); (2) failure to

17 | pay wages for all hours worked, Cal. Labor Code §§ 204, 1194, and Wage Order 8; (3) failure to

18 | provide legally compliant meal and rest periods or compensation in lieu thereof, Cal. Labor Code

19 | §§ 226.7, 512, and Wage Order 8; (4) failure to pay wages upon separation of employment, Cal.

20 | Labor Code §§ 201–203; (5) failure to furnish accurate wage statements, Cal. Labor Code § 226;

21 | and (6) unfair competition law violations, Cal. Bus. & Profs. Code § 17200, et seq.[3]  Doc. No. 25.

22 | As pleaded, the minimum wage claim is derivative of the all hours worked claim, and each of the

23

24 | [2] Also before the Court is Leprino's request for leave to file a sur-reply in opposition to Perez's motion, as well as
25 | Perez's opposition to this request.  Doc. Nos. 69 & 70.  In brief, Leprino seeks an opportunity to respond to a section
in Perez's reply brief that asks the Court to strike or view with skepticism certain declarations and testimony presented
26 | by Leprino on grounds of witness coercion.  Leprino asserts that this content consists of new argument that
misrepresents the facts and misstates the law.  Having considered the matter within the greater context of this
27 | certification dispute, the Court declines Perez's invitation to strike or otherwise disregard any of the challenged
evidence.  Accordingly, Leprino's request to file a sur-reply will also be denied.

28 | [3] Perez also pleaded causes of action for failure to pay overtime wages and conversion; however, the Court previously
granted Leprino's motion to dismiss these claims.  Doc. No. 29.

latter three claims (separation wages, wage statements, and unfair competition) is derivative of the all hours worked and meal and rest periods claims.  Perez now seeks certification of the class for purposes of all six claims.  Doc. No. 48.

## **LEGAL STANDARD**

A class action is a procedural mechanism that allows for representative litigation.  This means that one or more class members may "litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation."  1 William Rubenstein, Newberg on Class Actions § 1:1 (5th ed. 2012) (citing Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 363 (1921)).  "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–01 (1979)).

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which imposes a two-step test for deciding whether a class may be certified.  Under the first step, the court determines whether the moving party has established four perquisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  If the prerequisites of Rule 23(a) are met, the court considers whether the proposed class action meets at least one of the three provisions of Rule 23(b).  Fed. R. Civ. P. 23(b).  Relevant here, Rule 23(b) states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

A party moving to certify a class action bears the burden of affirmatively demonstrating compliance with Rule 23.  Comcast, 569 U.S. at 33.  "The Rule 'does not set forth a mere pleading standard,'" but instead demands the moving party establish through evidentiary proof that the proposed class action satisfies the prerequisites of Rule 23(a) and one of the provisions of Rule

23(b).  Id. (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).[4]  To ensure the

moving party has "satisfied" its burden, the district court must conduct a "rigorous analysis."  Id.

Because the "class determination generally involves considerations that are enmeshed in the

factual and legal issues comprising the plaintiff's cause of action," this rigorous analysis may

include "prob[ing] behind the pleadings" and "overlap with the merits of the plaintiff's underlying

claim."  Id. at 33–34.  Yet, "'[n]either the possibility that a plaintiff will be unable to prove his

allegations, nor the possibility that the later course of the suit might unforeseeably prove the

original decision to certify the class wrong, is a basis for declining to certify a class which

apparently satisfies' Rule 23."  Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1004–05 (9th Cir.

2018) (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).  Ultimately, the decision to

grant or deny a motion for class certification under Rule 23 is committed to the broad discretion of

the trial court.  Bateman v. Am. Multi–Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).

## DISCUSSION

### A.      Class Definition

Before turning to the requirements of Rule 23(a) and (b)(3), an issue regarding the

proposed class definition must be resolved.  Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a

class action must define the class . . . .").  District courts have discretion to modify class

definitions where necessary.  Nevarez v. Forty Niners Football Co., 326 F.R.D. 562, 575 (N.D.

Cal. 2018); Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586, 594 (E.D. Cal. 2008).

Perez seeks certification of the following class:

> All non-exempt hourly workers who are currently employe[d], or formerly have
> been employed, as non-exempt hourly employees at Leprino's Lemoore East plant
> in Lemoore, California, at any time within four years prior to the filing of the
> original complaint until resolution of this action.

With one exception, this definition describes a class that is ascertainable based on objective

---

[4] Courts generally require the moving party to demonstrate by a preponderance of the evidence that class certification is appropriate.  3 Newberg on Class Actions § 7:21 (citing cases, including Martin v. Sysco Corp., 325 F.R.D. 343, 354 (E.D. Cal. 2018) ("While Rule 23 does not specifically address the burden of proof to be applied, courts routinely employ the preponderance of the evidence standard.")).

4

criteria.[5]  The lone problem rests with the class period's unspecified end date—"until resolution of

this action"—which both "creates a moving target and presents potential case management

problems."  Taylor v. Autozone, Inc., No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14,

2011); Hart v. Rick's NY Cabaret Int'l, Inc., Case No. 09-cv-3043, 2013 WL 11272536, at *5

(S.D.N.Y. Nov. 18, 2013) (explaining why an "open-ended end-date is untenable").  A specified

end date, in contrast, promotes the "interests of clarity and finality" and "helps ensure that

plaintiff-specific discovery will be completed in a timely manner."  Taylor, 2011 WL 2357652, at

*1.  Perez confronts this problem in his reply brief and states that the class definition should be

revised to include a specified end date.  The Court agrees, and will exercise its discretion to set a

new class period end date as the date of this certification order.  See id. (redefining unascertainable

class period end date as date of conditional class certification order); Cruz v. Dollar Tree Stores,

Inc., No. 07-cv-2050, 2009 WL 1974404, at *2 (N.D. Cal. July 2, 2009) (redefining

unascertainable class period end date as the date of certification order).


### B.    Numerosity

Pursuant to Rule 23(a)(1), a class action is maintainable only if "the class is so numerous

that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Leprino does not contest

that the proposed class satisfies this requirement.  Based on the parties' representations, the

proposed class includes at least 300 individuals.  Crist Decl. ¶ 10.  This satisfies the numerosity

requirement of Rule 23(a)(1).  See Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.,

---

[5] The Court rejects Leprino's contention that the proposed class is not "ascertainable" because it captures employees who have not suffered injury and indiscriminately lumps all class members together for purposes of several different theories of potential liability.  Recognizing that presentation of an ascertainable class is often considered an implicit prerequisite to certification, the Court finds that Perez's proposed class is clearly defined and identifiable based on objective criteria.  See Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 nn.3–4 (9th Cir. 2017) (describing ways in which courts have considered "ascertainability" within certification decisions under Rule 23).  Leprino's reliance on *Ortiz v. CVS Caremark Corp.*, No. C-12-05859 EDL, 2013 WL 6236743, at *5–6 (N.D. Cal. Dec. 2, 2013), is unavailing.  In *Ortiz*, the court found that two subclasses were not ascertainable because there were no records showing which employees performed the work activity that allegedly went uncompensated.  The same problem is not present here.  Perez seeks certification of a proposed class based on all individuals who worked for Leprino as nonexempt, hourly employees at the Lemoore East facility during the specified class period.  At this time, it can be presumed that Leprino has maintained records identifying such individuals.  (The Court will also presume that relevant records exist regarding the on-duty meal period and separation wages subclasses that are discussed in more detail below.)

1   249 F.R.D. 334, 347 (N.D. Cal. 2008) (stating that "precedent suggests that 20–40 class members

2   is the 'grey area' for numerosity"); see also Gomez v. J. Jacobo Farm Labor Contractor, Inc., 334

3   F.R.D. 234, 251 (E.D. Cal. 2019) (explaining that an exact number of class members is not

4   required for certification if it is reasonable to believe that joinder would be impracticable).

5

6        **C.    Commonality**

7        Pursuant to Rule 23(a)(2), a class action is maintainable only if "there are questions of law

8   or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To meet the commonality requirement,

9   class claims must be based on a "common contention . . . capable of classwide resolution."  Wal-

10  Mart Stores, 564 U.S. at 350.  This means that determination of the "truth or falsity" of that

11  contention "will resolve an issue that is central to the validity of each one of the claims in one

12  stroke."  Id.  Certification does not turn on "the raising of common 'questions'—even in droves—

13  but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the

14  resolution of the litigation."  Id. (quoted source omitted).  In other words, not "every question of

15  law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single significant

16  question of law or fact.'"  Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir.2013)

17  (emphasis omitted) (quoting Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012)).

18       Using his six pleaded causes of action, Perez asserts three class claims:  an off-the-clock

19  claim, a meal and rest period claim, and the derivative claims (considered as one).  These claims,

20  and Perez's theories of liability for each, will be examined in turn.  See Jimenez v. Allstate Ins.

21  Co., 765 F.3d 1161, 1165–66 (9th Cir. 2014) ("Whether a question will drive the resolution of the

22  litigation necessarily depends on the nature of the underlying legal claims that the class members

23  have raised.").

24

25            **1.    Off-the-clock claim**

26       California's Wage Order 8 applies broadly to industries handling products after harvest.

27  Cal. Code. Regs. tit. 8 § 11080(1).  Under the law, employers must pay employees "not less than

28  the applicable minimum wage for all hours worked."  Id. § 11080(4)(B).  "'Hours worked' means

the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Id. § 11080(2)(G).  Under this definition, pre- or post-shift activities may be considered hours worked if the employees are "subject to the control" of their employer.  See Morillion v. Royal Packing Co., 22 Cal. 4th 575, 587 (2000).  To establish liability for an off-the-clock claim, a plaintiff must prove that (1) work was performed for which compensation was not received; (2) the defendant knew or should have known that the plaintiff performed this work; and (3) the defendant stood idly by.  Jimenez, 765 F.3d at 1165 (citation omitted).

Perez alleges that putative class members were not paid for off-the-clock work because of Leprino's uniform policies and practices regarding pre- and post-shift activities.  He presents his case as follows:  Under the CBA, Leprino compensates employees for hours worked as calculated by their shift times plus fourteen minutes for donning and doffing.  Doc. No. 48-2 at 11–12. Leprino requires employees to perform certain activities before and after their shifts, including donning and doffing uniforms and protective equipment; clocking in and clocking out; sanitizing the person and equipment in the "red line room"; and walking to pre-shift meetings and from the production floor.  Employees spend more than fourteen minutes performing all of these pre- and post-shift activities.  Leprino knew or should have known this was happening, but did not compensate employees for the additional time spent working.  Perez contends that commonality is satisfied because putative class members are similarly situated with respect to these policies and practices.

The Court has previously recognized that the pre- and post-shift activities in Perez's allegations are appropriately classified as "hours worked" under California law.  Perez has since produced ample evidence regarding those activities.  With this evidence, Perez constructs a compelling theory based on three specific points of reference:  First, putative class members spend several minutes donning their uniforms and equipment before clocking in.  Douma Decl. ¶ 11; Douthat Dep. at 43; Haro Decl. ¶ 9; Hernandez Dep. at 101–02; Jimenez Dep. at 95; Jung Decl. ¶ 6; Laurel Decl. ¶ 11; Laurel Dep. at 48; Mattos Decl. ¶ 11; Mclean Decl. ¶ 12; Nicks Dep. at 74; Perez Dep. at 152; Threadgill Decl. ¶ 10; Yaeger Decl. ¶ 11.  Second, putative class members then

clock in seven minutes before their shifts actually start.  Douthat Dep. at 57, 78; Haro Decl. ¶ 9; Hernandez Dep. at 101–02; Jimenez Dep. at 94; Nicks Dep. at 248; Oliveira Dep. at 22, 141; Perez Dep. at 159; Threadgill Decl. ¶ 10; Yaeger Decl. ¶ 11.  And third, putative class members spend several minutes doffing their uniforms and equipment after clocking out.  Agler Dep. at 45; Douma Decl. ¶ 12; Hernandez Dep. at 109; Jung Decl. ¶ 6; Laurel Decl. ¶ 12; Mattos Decl. ¶ 12; Mclean Decl. ¶ 12; Oliveira Dep. at 147, 153; Perez Dep. at 178, 183; Threadgill Decl. ¶ 11; Yaeger Decl. ¶ 11.  Put together, Perez's theory comes to life:  between these three stages, employees spend more than fourteen minutes performing work before and after their shifts.  One witness spelled this theory out perfectly in his declaration:

> I pick up my clean uniform and put it on, which takes me about five minutes, if that.  I then wait to clock in no more than seven minutes before my scheduled start time.  At the end of the shift, I clock out and then take off my uniform, which takes me about four to five minutes.

Yaeger Decl. ¶ 11.  If this employee and the rest of the putative class spend ten minutes donning and doffing and an additional seven minutes on the clock before their shifts actually began, they perform three minutes of work beyond that for which compensation is received under the CBA.  If proved that Leprino stood idly by despite actual or constructive knowledge of this fact, the putative class members could recover for underpayment of their time.

Based on the evidence presented, the Court finds that Perez has demonstrated that three common questions will drive resolution of his off-the-clock claim:  (1)  whether Leprino had uniform policies and practices that effectively required employees to perform pre- and post-shift activities in excess of fourteen minutes; (2) whether Leprino knew or should have known that employees were working off-the-clock without compensation; and (3) if so informed, whether Leprino elected to do nothing in response.  These common questions mirror the legal test for off-the-clock claims under California law, and are precisely the kind of questions that Rule 23(a)(2) requires.  Jimenez, 765 F.3d at 1165–66.

Leprino's arguments against commonality are unavailing.  Leprino first contends that evidence does not show that employees spend more than fourteen minutes performing pre- and post-shift activities.  Leprino particularly emphasizes evidence showing that some employees

spend less than fourteen minutes donning and doffing.  This evidence notwithstanding, Leprino's narrow focus fails to grapple with Perez's actual theory.  The CBA provides for fourteen minutes of additional compensation for donning and doffing.  But Perez's off-the-clock claim is premised on employees spending more than fourteen minutes performing *all* of their pre- and post-shift activities, not just donning and doffing.  Thus, even if donning and doffing takes less than fourteen minutes, employees may perform off-the-clock work if the rest of their required pre- and post-shift activities push them over that threshold.  The witness declaration quoted above shows exactly how this could happen.

Leprino next argues that, based on passages in the certification motion, Perez seeks to define as compensable all activities occurring after employees enter the Lemoore East parking lot regardless of whether the employees were actually under employer control.  Perez contends that this misrepresents his actual claim, and that he discusses evidence regarding employees' arrival times merely to show when employees feel the need to come to work in order to perform their essential pre-shift duties.  As explained above, Perez has established commonality based on evidence regarding pre- and post-shift activities that the parties do not dispute constitute hours worked.  Thus, at this time, the Court declines to further delve into disagreements on the margins of what other pre- and post-shift activities may be compensable.

### 2.   Meal and rest period claim

Under California law, an "employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health."  Cal. Labor Code § 226.7(b).  If a legally compliant meal or rest period is not provided, "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest . . . period is not provided." Cal. Labor Code § 226.7(c).

Perez presents three theories of recovery in support of his claim for meal and rest period violations.  First, he contends that the meal and rest period policies set forth in the CBA are

facially unlawful.  Second, he contends that Leprino's policies and practices require employees to remain "on call" or subject to employer control during their breaks.  Third, he contends that Leprino failed to provide legally compliant breaks because of its "red line room" policies and practices.  The Court will consider these theories in turn.

### a.   Facially unlawful theory

Perez argues that the CBA's meal and rest period terms violate Wage Order 8's provisions on such matters.  Where an employer's policy violates the law on its face, classwide liability can be established through common proof that the employer uniformly enforced the legally noncompliant policy.  See Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 604 (E.D. Cal. 2015) (collecting cases that found the commonality requirement satisfied for claims based on an applicable and uniformly applied policy); see also Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1033 (2012) ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.").

### i.   Rest periods

With regard to rest periods, Wage Order 8 provides:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3½) hours.  Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

Cal. Code Regs. tit. 8, § 11080(12)(A).

As for the CBA, Section 12, titled "Relief Periods," provides:

> The Employer agrees to provide adequate relief and rest periods of ten (10) minutes during the first half of the shift and ten (10) minutes during the second half of the shift.  The employee will be entitled to an additional ten (10) minute rest period when they are working two (2) or more hours of overtime.

Doc. No. 48-2 at 18.[6]

Perez contends that this provision violates Wage Order 8 because it fails to state (1) when rest periods should be taken, (2) that rest periods should be taken in the middle of the work period "insofar as practicable," and (3) that a rest period must be provided every "four hours or major fraction thereof."

Perez's first and second contentions can be handled together:  namely, other than the language "insofar as practicable shall be in the middle of each work period," Wage Order 8 does not prescribe when rest periods are to be taken.  <u>Brinker</u>, 53 Cal. 4th at 1031.  Perez is correct in noting that Section 12 does not mirror Work Order 8 on this front.  But nothing suggests that omission of this language violates the law.  That is, it cannot be said that by virtue of this omission Leprino has a uniform policy to *not* authorize or permit rest periods during the middle of each work period.  It simply means that, in so far as Section 12 is concerned, Leprino has no written policy on the timing of rest periods.  Although liability to the class could still be established if evidence showed that Leprino uniformly enforces an unwritten policy or practice that allegedly violates the law—for example, evidence showing that employees are regularly forced to take rest periods at the end of work periods—Perez has not presented evidence of this kind.[7]  And with no such showing, Perez has not demonstrated the existence of a common contention capable of driving classwide resolution.  <u>See Ordonez v. Radio Shack, Inc.</u>, No. CV 10-7060-CAS (JCGx), 2013 WL 210223, at *7–8 (C.D. Cal. Jan. 17, 2013) (rejecting argument that a common question

---

[6] For purposes of this motion, the parties have presented to the Court a copy of the CBA that was in effect at the time this lawsuit was filed on April 13, 2017.  The CBA states that it was to be in effect from January 1, 2014, through December 31, 2018.  Doc. No. 48-2 at 5.  While this time period is narrower than the time period the class definition covers, the parties have not represented that material differences exist between applicable CBAs.  Accordingly, for purposes of this motion, the Court will proceed with that understanding as well.

[7] The witness statements that Perez relies upon for this theory show that breaks were sometimes delayed because certain work needed to be complete.  Agler Dep. at 68–69 ("I have been told that you have to wait to take a break.  We have to get this done."); Hernandez Dep. at 120 (explaining that breaks were taken when workload allowed); Jimenez Decl. ¶ 12 ("We are not permitted to take a Rest Break until we are finished cleaning at the beginning of our shift.").  Far from establishing unlawfulness, however, this evidence fits into the flexibility provided by the "insofar as practicable" language of Wage Order 8.  <u>Brinker</u>, 53 Cal. 4th at 1031 ("Employers are thus subject to a duty to make a good faith effort to authorize and permit rest breaks in the middle of each work period, but may deviate from that preferred course where practical considerations render it infeasible.").  Likewise, contrary to Perez's suggestion otherwise, an employee can take a rest period and a meal period back-to-back and still fully comply with Wage Order 8's requirements.  <u>See</u> Jimenez Decl. ¶ 12 ("[T]hough my shift starts at 6:30 a.m., my first rest break is often not until 9:30 and I take it in conjunction with my 30 minute meal break.").

capable of resolution through a common answer is available where employer's policy was facially legal and evidence did not otherwise show existence of uniform policy); see also Brinker, 53 Cal. 4th at 1051 ("[F]or this claim neither a common policy nor a common method of proof is apparent. . . . The only formal [employer] off-the-clock policy submitted disavows such work, consistent with state law.  Nor has [the class representative] presented substantial evidence of a systematic company policy to pressure or require employees to work off-the-clock . . . .").

Nor has he carried his burden as to his contention that Section 12 is facially unlawful because it does not give effect to Wage Order 8's "four hours or major fraction thereof" language. In Brinker, the California Supreme Court interpreted this language to mean that "[e]mployees are entitled to 10 minutes rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." 53 Cal. 4th at 1029.  The Brinker court affirmed certification was proper as to a uniform policy that authorized rest periods for each four hours of work.  53 Cal. 4th at 1033−34. The court explained that "[c]lasswide liability could be established through common proof if [the class representative] were able to demonstrate that, for example, [the employer] under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours." Id. at 1033.

Here, in contrast, Perez has not provided evidence of a uniform policy that conflicts with the law.  The CBA dictates that employees are entitled to two rest periods for every shift, and an additional rest period if two hours of overtime are worked.  The CBA elsewhere describes the standard shift as eight hours of work completed within a nine-hour workday, and contemplates alternative schedules for ten-hour shifts.  Across the board, this allotment of rest periods per shift time is consistent with the law as interpreted in Brinker.  Once more, Perez could have presented evidence showing that Leprino's unwritten policies and practices require employees to work shifts without the appropriate amount of rest periods—for instance, evidence showing that employees working ten-hour shifts do not receive a third rest period when working more than ten hours but less than two hours of overtime.  But the parties have not presented evidence of this kind, nor for that matter is there evidence in the record showing that rest periods were regularly and uniformly

deprived in any fashion.  While Perez is not required to conclusively prove his case at this stage, he must offer some proof that the allegedly unlawful policy upon which he bases his claim does in fact exist.  See Rojas-Cifuentes v. ACX Pac. Nw. Inc., No. 2:14-cv-00697-JAM-CKD, 2018 WL 2264264, at *7–8 (E.D. Cal. May 17, 2018) (rejecting commonality argument where employer's written policy was not facially unlawful and no further showing of common policy or practice); Ordonez, 2013 WL 210223, at *7–8.  Without evidence of a uniform policy or practice, Perez has not demonstrated the existence of common issues capable of resolution on a classwide basis.  And without commonality, the Court will not certify the class claim as to this specific theory of liability.

### ii.   Meal periods

Perez contends that the CBA provision regarding second meal periods is facially unlawful.  Relevant here, Wage Order 8 provides:

> An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

Cal. Code Regs. tit. 8, § 11080(11)(B).

Section 22(D) of the CBA provides:

> No employees of Leprino Foods, Lemoore East plant work paid lunches unless job bids so state, and/or mutual agreement between the Company, the Union and the affected employee.  The Company and the Union agree that all employees are provided with and are expected to take a 30-minute off-duty meal period for every 5 hours worked.  Employees in the following positions have historically chosen to work through meal breaks:  Processing Sanitation, Cheese Sanitation, Forepersons, Whey Department and 3rd Shift Warehouse.  If these employees choose to work through their meal periods, they will be paid for the time worked, but will not receive penalty pay.  At no time will any employee be required to work through a meal period.  No employee is permitted to work through his or her second meal period if he or she works more than 10 hours and did not take a first meal period.  Employees in other positions that have not historically chosen to work through meal breaks will not generally be permitted to choose to work through a meal period.

Doc. No. 48-2 at 29.

Perez contends that this uniform policy is unlawful because it fails to inform (1) when a

second meal period must occur, (2) that a second meal period can be waived with mutual consent if the first meal period was not waived and the employee works more than ten hours but less than twelve, and (3) that a second meal period cannot be waived if an employee works more than twelve hours.

This policy is not facially inconsistent with the law in the ways Perez suggests.  Section 22(D) informs employees that they are provided with and expected to take a meal period for every five hours worked.  In other words, employees working ten hours are provided with and expected to take two meal periods.  This complies with Wage Order 8.  See Brinker, 53 Cal. 4th at 1042 (explaining that a second meal period is legally required "after no more than 10 hours of work in a day, i.e., no later than what would be the start of the 11th hour of work, absent waiver").  The policy also informs employees that a second meal period cannot be waived if the employee did not take his or her first meal period.  This too complies with Wage Order 8.  Although the policy does not inform employees that they cannot waive a second meal period if working more than twelve hours, this omission alone is neither inconsistent with Wage Order 8 nor evidence of an unlawful policy.  Moreover, Perez has not presented evidence demonstrating that Leprino enforces an unwritten policy or practice that violates the law in this fashion.  Perez presented statistical analysis evidence regarding 1,400 shifts longer than ten hours (or 2,124 shifts based on clock-in and clock-out times); however, this evidence does not identify how many of these shifts, if any, were both longer than twelve hours and missing a second meal period.  See generally Dann Decl.  One witness declared that "[t]here have been many days that I have worked over 10 and 12 hours without having been provided with a second thirty-minute meal break."  Haro Decl. ¶ 13.  But this statement alone is not enough to carry the burden in showing a facility-wide policy or practice.

Perez also contends that the CBA is facially invalid as to on-duty meal periods.  Wage Order 8 provides:

> Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked.  An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to.  The written agreement shall state that the employee may, in writing, revoke the

14

1    agreement at any time.

2   Cal. Code Regs. tit. 8, § 11080(11)(C).

3        Section 22(C) of the CBA provides:

4        Where the nature of the work prevents an employee from taking an off-duty meal
         period, the Employer may schedule a shift of eight (8) continuous hours by written
5        mutual agreement with the Union and the affected employee.  In that situation, the
         meal period shall be considered an on-duty meal period which shall be paid time.
6

7   Doc. No. 48-2 at 29.

8        Perez argues that this provision is unlawful because it fails to inform employees that on-

9   duty meal period agreements must state that they are subject to employee revocation at any time.

10       Once more, this provision is not unlawful just because it does not mirror the applicable law

11  in its entirety.  Here, however, Perez's argument also stands on evidence beyond an underinclusive

12  CBA provision.  Namely, Leprino acknowledges both that some employees work shifts with an

13  on-duty meal period and that it has not entered into any written agreements concerning on-duty

14  meal periods, much less written agreements "stat[ing] that the employee may, in writing, revoke

15  the agreement at any time."  Moreover, Leprino's 30(b)(6) witness declared that written

16  agreements are not used because Leprino does not have positions where the nature of the work

17  prevents employees from taking a thirty-minute, off-duty meal period.  Nicks Decl. at ¶ 13; Nicks

18  Dep. at 188–90, 194, 215.  This evidence appears to contradict Wage Order 8 multiple times over.

19  Leprino's response that the CBA elsewhere indicates that every on-duty meal period is a voluntary

20  choice of the employee—i.e., a waiver defense of sorts—does not change that fact.  Instead,

21  certification is warranted on a common issue appropriate for class resolution as to whether

22  Leprino's uniform policy violated the law.  See Naranjo v. Spectrum Sec. Servs., Inc., 40 Cal.

23  App. 444, 458–60 (2019), review granted on other issues, 455 P.3d 704 (Jan. 2, 2020) ("[I]f all the

24  requirements for a compliant on-duty meal period are not met, e.g., there is no signed agreement

25  with a right-to-revoke clause, the employer owes employees their regular wage for working during

26  the meal break, plus one hour of premium pay for every workday the meal break policy was

27  noncompliant, also at the employees' regular rate of compensation.").

28       As one final matter, Perez recognizes that a subclass may be needed for purposes of this

specific theory of liability because not every putative class member was affected by Leprino's on-duty meal period policies and practices.  The Court agrees, and will use the following subclass for purposes of this claim and theory of liability:

> All non-exempt hourly workers who are currently employed, or formerly have been employed, as non-exempt hourly employees at Leprino's Lemoore East plant in Lemoore, California, at any time within four years prior to the filing of the original complaint until January 6, 2021, and who worked at least one shift that included an "on-duty meal period," otherwise described as a shift of continuous work with a meal period taken on the clock or a "straight 8" shift.

### b.     On-call theory

Perez's second theory of liability for the meal and rest period claim is commonly known as an "on call" theory.  Under California law, "employees must not only be relieved of work duties [during breaks], but also be freed from employer control over how they spend their time." Augustus v. ABM Sec. Servs., Inc., 2 Cal. 5th 257, 270 (2016); see also Brinker, 53 Cal. 4th at 1038–39 (stating that the "fundamental employer obligations associated with a meal break" are "to relieve the employee of all duty and relinquish any employer control over the employee and how he or she spends the time").  In *Augustus*, the California Supreme Court explained that if employees are effectively "on call" during meal or rest periods because conditions require them to be ready and capable of being summoned to action, then the breaks provided are not control-free and, consequently, not legally compliant.  2 Cal. 5th at 270.

There is no dispute that Leprino has written policies of providing meal and rest periods. Perez contends that, these policies notwithstanding, Leprino enforces unwritten policies and practices that effectively require putative class members to remain on-call during their breaks.  See Brinker, 53 Cal. 4th at 1040 ("[A]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks.").  Perez makes his case as follows:  (1) Leprino's polices instruct putative class members to always answer their supervisor's questions and follow their instructions, with no exceptions made for breaks; (2) some employees are assigned radios that are carried at all times, including during breaks; (3) Leprino installed a telephone and intercom system in the breakrooms so that employees can be reached while on break; (4) when breaks are interrupted, Leprino does not pay premium pay or

allow employees to restart their breaks; (5) the testimony of the putative class members confirm that these policies and facts have created a culture of on-call breaks; (6) putative class members confirm they are required to answer their radios, listen for their names on the intercoms, respond to calls in the breakroom, and respond to supervisors during their breaks; and (7) putative class members are disciplined, suspended, or even terminated if they fail to respond to questions or return to work when asked.  Put together, Perez asserts that this theory of liability naturally poses a common question that is central to his claim:  namely, in light of Leprino's uniform policies and practices, are the class members actually on call during breaks?  Said differently, are the class members not truly freed from Leprino's control during their breaks?

The Court finds that Perez has offered enough proof in support of his theory.  Across numerous declarations and depositions from putative class members, Perez has presented evidence suggesting that meal and rest periods are interrupted for work-related reasons.  Agler Decl. ¶ 7; D. Armor Decl. ¶¶ 7, 10; J. Armor Decl. ¶¶ 8–10; Carrier Decl. ¶ 6; Dillard Decl. ¶ 8; George Dep. at 22; Haro Decl. ¶¶ 4, 6, 7, 10; Haro Dep. at 72, 91; Jimenez Decl. ¶¶ 5–8; Laurel Decl. ¶¶ 7–10; Laurel Dep. at 70; Mclean Decl. ¶ 8; Nakken Dep. at 119; Oliveira Decl. ¶¶ 9, 11; Oliveira Dep. at 108–09; Threadgill Decl. ¶¶ 4–6; Threadgill Dep. at 81–82.  Numerous witnesses also professed to having believed that they are expected to respond to work-related communications during breaks. Agler Dep. at 33–34 ("[I]t's been the practice since I have been there that we always have [the radio] on, have it on us, and answer it when called.  Just common practice."); D. Armor Decl. ¶ 12 ("We have been trained that if we are asked a work-related question at any time during a work day, including meal and rest breaks, we must answer the question.  I am responsible for my job at all times during my shift."); J. Armor Decl. ¶ 6 ("[I]f I was asked a work related question during a meal or rest break, I was expected to answer the question[.]"); Haro Dep. at 65–66 ("It's expected that you follow orders from your supervisor."); Hernandez Dep. at 132 (understanding that employees had to listen to supervisors' instructions and failures to obey would be considered insubordination); Jimenez Dep. at 84, 86 ("[E]verybody just did what they were supposed to do, answer the phone calls, answer the pages."); Laurel Decl. ¶ 4 ("I am required to carry this radio with me at all times including during meal and rest breaks and to answer it during meal and rest

breaks if called upon with a work related question[.]"); Laurel Dep. at 86 ("It's common practice

that we were on call."); Threadgill Decl. ¶ 7 ("I have considered that I was required to answer

work related questions during my meal and rest breaks because I was responsible for production at

my workstation and I did not want to be accused of insubordination."); Threadgill Dep. at 81–82,

105–06 ("Because we have problems.  You have to get back and help bulk off.  It's our job.").[8]

In light of this evidence, there exists a common question as to whether Leprino's uniform

policies and practices compel employees to remain on-call during their meal and rest periods.

This common question is central Perez's claim and one that can be answered with common proof

regarding common injury.  If at trial the jury answers yes, then Leprino is liable to the class for

meal and rest period violations; if the answer is no, then Leprino is not liable.  This satisfies the

commonality requirement under Rule 23(a)(2).  See Wright v. Renzenberger, Inc., No. CV 13-

6642 FMO (AGRx), 2017 WL 9831398, at *7 (C.D. Cal. Sept. 30, 2017) (finding common

question as to whether drivers were on-call during rest periods based on uniform policy); Ayala v.

U.S. Xpress Enters., Inc., No. EDCV 16-137-GW(KKx), 2017 WL 3328087, at *10 (C.D. Cal.

July 27, 2017) ("[L]liability will turn on whether 'securing the load' and responding to alerts

messages rises to the level of employee control that would turn any break periods provided into

impermissible on call breaks, that would consequently require compensation.").

Leprino's arguments against commonality are not persuasive.  A core theme of these

arguments is Leprino's failure to engage Perez's actual theory.  For instance, Leprino argues that

the evidence does not show it enforces a uniform radio policy because only a fraction of

employees carry radios.  And it argues that evidence regarding the breakroom phones and

intercom system is not telling because not every employee recalled being contacted through these

channels.  But focusing on separate methods of communication in isolation misconstrues the

integrated on-call theory that Perez is making.  In declarations and depositions, putative class

members consistently acknowledged that breaks—their own and those of their coworkers—are

---

[8] On a related matter, the parties dispute the value of evidence regarding a September 2013 incident where Perez was disciplined for disobeying a supervisor's instruction to stay at his work station to complete a specific task.  Given the evidence above demonstrates both that this specific evidence is not some sort of tipping point and that Perez has carried his commonality burden for purposes of this claim, the Court need not conclusively resolve this dispute here.

interrupted through various means.  This includes radios, which putative class members averred

are used to contact employees during breaks about work-related matters, including efforts to find

other employees.  J. Armor Decl. ¶¶ 4, 7; George Dep. at 22; Haro Decl. ¶ 7; Haro Dep. at 61–62;

Hernandez Dep. at 131; Laurel Decl. ¶ 4; Laurel Dep. at 70; Oliveira Dep. at 104; Yeager Decl.

¶ 6.  This also includes intercom communications.  Agler Decl. ¶ 7; Agler Dep. at 83; J. Armor

Decl. ¶ 8; Haro Decl. ¶¶ 4, 6; Haro Dep. at 72; Hernandez Dep. at 131; Jimenez Decl. ¶ 6; Laurel

Decl. ¶ 7; Threadgill Decl. ¶ 5; Threadgill Dep. at 81.  And interruptions caused by the breakroom

phones or in-person messages.  Agler Decl. ¶ 7; D. Armor Decl. ¶¶ 7, 10; J. Armor Decl. ¶¶ 8, 9;

Dillard Decl. ¶ 8; Haro Decl. ¶¶ 4, 6; Haro Dep. at 57–58, 62–63, 65–66; Hernandez Dep. at 132;

Jimenez Decl. ¶¶ 5, 8; Laurel Decl. ¶ 8; Perez Dep. at 190–91, 252–54; Threadgill Decl. ¶¶ 5–6;

Threadgill Dep. at 86, 87; Yeager Decl. ¶ 6.  As one witness neatly described the matter:

> If there's no radio in their area, they use the intercom.  Whatever is closer.  If they
> can get to an area where there's a radio, they'll use the radio.  If they can get to an
> area where a phone is there, they'll use the phone.  That's assuming they don't find
> somebody else on the floor that can help them.  You know?

Nakken Dep. at 119.

Collectively, this evidence stands up to Leprino's piecemeal challenges.  Perez

acknowledges that not every employee was subject to every kind of interruption.  But his

integrated theory does not depend on that being the case.  Rather, he seeks recovery on the basis

that combining all these individual practices creates a uniform policy that itself violates the law as

to all putative class members.  In that sense, even if an individual practice is not directly

applicable to all employees—such as those who did not carry radios—evidence of that practice

may be reasonably considered by the factfinder as one part of an environment where employees

are effectively on-call at all times.

Perez's evidence also stands up against Leprino's emphasis of other evidence, including

minutes from a 2015 meeting between Leprino and the Union, which arose from some employees'

belief that they were required to keep radios on during meal breaks and resulted in Leprino

providing penalty pay for interrupted breaks.  Leprino contends that this shows the special effort it

made to inform employees that they are not required to monitor radios during breaks.  While

evidence of this kind could certainly contribute to a defense against this claim (on both the merits and in damages calculations), it does not erase from the record the other evidence that has been presented.  This is also true with regard to Leprino's argument that a uniform policy cannot exist because employees are free to take breaks outside or away from the facility.  Substantial evidence before the Court shows that breaks are interrupted regardless of whether employees have this freedom.

### c.    Red line room

For his third theory of liability, Perez contends that employees do not receive full meal and rest periods because of Leprino's requirement that they complete sanitizing procedures in the "red line room."  Perez argues that employees have not been compensated for these meal and rest period violations, and that there exists a common question as to whether Leprino's uniform policies and practices deprive employees of the meal and rest periods to which they are entitled.

There is no dispute that according to Leprino's policies employees are to pass through the red line room before entering and exiting to the production floor, Nicks Dep. at 76, 266–68; and that therein employees must spend a few minutes completing boot-scrubbing and hand-washing procedures.  Nicks Dep. 81–83.  Leprino argues, however, that Perez has presented no evidence that meal and rest periods are actually shortened (to an unlawful level) because of these requirements, much less that any discrepancies occur because of some facility-wide policy or practice.  Instead, Leprino continues, employees testified that they complete these tasks on the clock and take break times long enough to compensate for the required procedures.

Perez has not identified specific evidence on this theory, nor has he responded to Leprino's particular points of opposition.  With his motion, Perez presented statistical analysis evidence showing that in a sample of over 20,000 shifts approximately 35% featured a meal period less than thirty minutes in duration.  Dann Decl. ¶ 12.  While it could be argued that this figure is attributable (at least in part) to red line room tasks cutting into employees' breaks, Perez has not made this case.  Instead, he merely cites general evidence regarding the red line room and how long it takes an employee to proceed through the required sanitizing procedures—no causal link is shown.  In fact, as Leprino points out, relevant evidence suggests that employees take meal

1   periods longer than thirty minutes and rest periods longer than ten minutes, and sometimes

2   expressly noted this is done to compensate for time spent walking to and from breakrooms and

3   passing through the red line room.  E.g., Agler Dep. at 89–90 (fifteen-minute rest periods); Dillard

4   Decl. ¶ 5 (thirty-minute rest periods and 45-minute lunch periods); Laurel Dep. at 53–54, 64–65

5   (15-minute rest periods, exclusive of walking and cleaning time); Nakken Decl. ¶ 4 (rest periods

6   of at least twenty-five to thirty minutes, exclusive of walking time); Nicks Decl. ¶ 14 (explaining

7   employees typically take twenty minutes or more for rest periods and forty minutes or more for

8   meal periods); Peeler Decl. ¶ 8 (rest periods of fifteen to twenty minutes); Perez Dep. at 78

9   (fifteen-minute rest periods); Post Decl. ¶¶ 6, 7 (rest periods of fifteen to twenty minutes and a

10  thirty-minute off-the-clock meal period); Threadgill Dep. at 68–69, 72–73 (forty-minute meal

11  periods and twenty-minute rest periods); Van Noort Decl. ¶ 4 (fifteen-minute rest periods and a

12  thirty-minute off-the-clock meal periods); Yaeger Decl. ¶ 7 (rest periods of ten to fifteen minutes,

13  exclusive of walking and cleaning time).[9]

14          In sum, Perez has not done enough to affirmatively demonstrate a common question exists

15  as to whether Leprino's policies and practices related to the red line room affect employees' meal

16  and rest periods.  See Rojas-Cifuentes, 2018 WL 2264264, at *8 (finding no commonality for a

17  meal period claim based on a walking-time and donning/doffing theory of liability without

18  evidence showing a uniform policy or practice).

19

20                          **3.      Derivative claims**

21          Perez asserts that the derivative class claims raise the same common questions that

22  undergird the other two class claims:  that is, whether Leprino's uniform policies and practices

23  effectively require class members to work off the clock and leave class members without legally

---

[9] Evidence that could have provided traction for this theory is elsewhere directly contradicted by the same witnesses.
For instance, one witness declared that "[i]t takes about 2 minutes to get to the break room during my 15 minute rest
break and about 3–4 minutes coming back because of work activities that I have to perform in the red line room."
Jimenez Decl. ¶ 13.  But during his deposition, the witness stated he usually took "[a]bout 20 minutes" away from his
work area for rest periods.  Jimenez Dep. at 31–32.  Another witness declared "[t]he walk from the production floor to
the break room is about 2 minutes, and about 2–3 minutes coming back.  I don't think I am able to take ten minutes
free of work in the break room during my rest breaks."  Haro Decl. ¶ 14.  Yet, the witness also described her rest
periods as "15 minute rest breaks" in her declaration.  Haro Decl. ¶ 8.  And at her deposition, the witness testified to
taking rest periods lasting "15, 17 minutes."  Haro Dep. at 49, 53 ("15-minute break").

noncompliant meal and rest periods.  The Court agrees, and Leprino does not dispute the issue.

Moreover, to the extent unique issues arise with the derivative claims, these too will rest primarily

on questions dependent on common proof.  See Negrete v. ConAgra Foods, Inc., No. CV 16-0631

FMO (AJWx), 2019 WL 1960276, at *12 (C.D. Cal. Mar. 29, 2019) ("These claims flow from the

causes of action which this court is certifying.  They present common questions, such as whether

defendants underpaid quitting or terminated workers, whether defendants provided accurate wage

statements to their employees, and whether defendants violated Cal. Bus. & Prof. Code §§ 17200,

et seq., by failing to follow California's wage and hour laws."); Boyd v. Bank of Am. Corp., 300

F.R.D. 431, 442 (C.D. Cal. 2014) (discussing derivative claims including unfair competition law

and separation wages violations).

Finally, while commonality is satisfied, a subclass is needed for the separation wages class

claim given that the relevant Labor Code provisions (§§ 201–203) will not apply to putative class

members who have been continuously employed by Leprino throughout the proposed class period.

Thus, the Court will exercise its discretion to define a separation wages subclass as follows:

> All persons who have been discharged from or quit employment as non-exempt
> hourly employees at Leprino's Lemoore East plant in Lemoore, California, at any
> time within four years prior to the filing of the original complaint until January 6,
> 2021.

### D.    Typicality

Pursuant to Rule 23(a)(3), a class action may be maintained only if the "claims or defenses

of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.

23(a)(3).  "[T]ypicality determines whether a sufficient relationship exists between the injury to

the named plaintiff and the conduct affecting the class so that the court may properly attribute a

collective nature to the challenged conduct."  1 Newberg on Class Actions § 3:29.  The test for

typicality is (1) "whether other members have the same or similar injury," (2) "whether the action

is based on conduct which is not unique to the named plaintiffs," and (3) "whether other class

members have been injured by the same conduct."  Wolin v. Jaguar Land Rover N. Am., LLC,

617 F.3d 1168, 1175 (9th Cir. 2010) (citations omitted).

Leprino largely does not contest Perez's assertion that, as a class representative, his claims

are typical of those of the class.  As a lone reference to typicality, Leprino describes Perez's testimony that it took him between twelve and eighteen minutes to don and doff as atypical and not illustrative of a common practice amongst the class.  Evidence suggests this not to be the case.  E.g., Jung Decl. ¶ 6 (donning takes about five to six minutes, doffing takes five minutes or less); Mclean Decl. ¶ 12 (not longer than fourteen minutes to don and doff).  But even more importantly, in focusing on Perez's specific testimony for one part of a single claim, Leprino misses the broader scope of the typicality inquiry.  Namely, in presenting his case, Perez has alleged and produced evidence showing that he and the other putative class members have suffered the same injuries—for example, Perez alleges that the class as a whole has not received all earned wages for work performed for Leprino's benefit.  Perez has not made claims based on conduct that is unique to him, but instead raises claims based on Leprino's policies and practices as they apply to the class.  He also contends that the class, himself included, have been injured by the same conduct of Leprino—for instance, the entire class was injured because Leprino failed to provide legally compliant meal and rest periods.  In sum, the typicality requirement of Rule 23(a)(3) is satisfied.

### E.  Adequacy of representation

Pursuant to Rule 23(a)(4), a class action is maintainable only if the "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The term "parties" refers to both the class representative and class counsel.  In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig., 270 F.R.D. 521, 531 (N.D. Cal. 2010).  The Ninth Circuit tests the adequacy as follows:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 (9th Cir. 2011) (quoted source omitted).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."  Id.

The Court finds that Perez is an adequate class representative, a matter that Leprino does not contest.  First, Perez is not conflicted.  He declares his primary interest is to prove Leprino

violated California's wage-and-hour laws in ways affecting the members of the proposed class. Perez Decl. ¶¶ 6, 13.  In so doing, Perez seeks recovery from Leprino itself, not any supervisors or other employees, and intends to continue in his representative capacity until there is a resolution in this case that is in the best interest of the proposed class.  Id., ¶ 8.  Second, Perez is sufficiently qualified to serve as class representative.  He has sought out and met with counsel to discuss the facts of the case, answer any questions about his experience working for Leprino, and assist in reviewing documents and responding to Leprino's production requests.  Id., ¶¶ 4, 7, 9.  He has also sat for a deposition.  Id., ¶ 5.  Perez recognizes his limitations with respect to his independent knowledge of all the facts and law particular to his claims, but he also understands the essence of this lawsuit.  Id., ¶¶ 4, 8, 10–11.

Leprino also does not challenge the adequacy of proposed class counsel, R. Rex Parris and the Parris Law Firm.  Mr. Parris declares that he and his law firm have significant experience litigating wage-and-hour claims and numerous class action lawsuits.  Parris Decl. ¶¶ 2–6.  Having considered the factors under Rule 23(g), the Court finds that proposed class counsel is adequate. Counsel (1) have sufficiently identified and investigated potential claims in this lawsuit; (2) have sufficient experience litigating class actions and wage-and-hour-related claims; (3) appear to have sufficient knowledge of the applicable wage-and-hour laws; and (4) appear to be willing and able to commit sufficient resources to representing the proposed class.  Fed. R. Civ. P. 23(g)(1)(A).

## F.    Predominance

Rule 23(b)(3) requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3). This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  The predominance inquiry logically involves two steps:  "a court must first characterize the issues in the case as common or individual and then weigh which predominate."  2 Newberg on Class Actions § 4:50.  An individual issue is one where the "members of a proposed class will need to present evidence that varies from member to member."  Tyson Foods, Inc. v. Bouaphakeo, 136 S.

Ct. 1036, 1045 (2016) (citing 2 Newberg on Class Actions § 4:50).  Whereas a common issue is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  Id.

In general, common issues will not predominate if "'a great deal of individualized proof' would need to be introduced or 'a number of individualized legal points' would need to be established after common questions were resolved," nor would they predominate if the resolution of an "'overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'"  2 Newberg on Class Actions § 4:50 (quoting Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004), and Cooper v. S. Co., 390 F.3d 695, 722 (11th Cir. 2004)).  On the other hand, common questions likely will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim," or if "adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced."  Id. (quoting Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003), and Klay, 382 F.3d at 1255).

### 1.    Off-the-clock claim

As discussed above, Perez's theory for his off-the-clock claim is that Leprino has uniform policies that violate California law to the detriment of the putative class members.  The key questions for this claim are whether those uniform policies exist, and if so, whether they violate applicable laws.  With these common contentions, predominance is satisfied here.  See Negrete, 2019 WL 1960276, at *4 (finding predominance for donning and doffing claims).

Against predominance, Leprino compares this case to others where an off-the-clock claim was not certified because a uniform policy was not shown to exist.  This effort falls flat.  In that situation, predominance is not met because, as one court put it, "[i]ndividualized issues regarding which employees performed the relevant functions on or off the clock, and why they performed those functions, predominate over common questions."  Troester v. Starbucks Corp., No. CV 12-07677-CJC (PJWx), 2020 WL 553572, at *8 (C.D. Cal. Jan. 27, 2020).  Notably, the *Troester* case—which is one that Leprino particularly relies upon—contrasted the case at hand where no

uniform practice was shown to exist with other cases where off-the-clock claims were certified because they "generally revolve[d] around company-wide policies."  Id. at *9.  Perez's claim is squarely in the latter camp.  He has presented evidence establishing that all putative class members are required to complete the same pre- and post-shift activities.  While this claim may entail individualized damages calculations, this alone does not preclude certification if class members are uniformly subject to a policy in a way that gives rise to consistent liability across the class.  See Wren v. RGIS Inventory Specialists, 256 F.R.D. 180, 206 (N.D. Cal. 2009) (determining that predominance was "satisfied as to donning and waiting time, notwithstanding the individual issues that will have to be addressed with respect to damages" where evidence suggests "a widespread practice . . . of failing to compensate class members for this time"); see also Comcast, 569 U.S. at 35 (Ginsburg and Breyer, JJ., joined by Sotomayor and Kagan, JJ., dissenting) (stating in case resolved on other grounds that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal" and that ordinarily "individual damages calculations should not scuttle class certification under Rule 23(b)(3)").

### 2.     Meal and rest period claim

The common questions identified above for purposes of Perez's meal and rest period claim also predominate individual inquiries that may appear.  Those common questions are based on Perez's allegations of Leprino's uniform policies regarding on-duty meal periods and on-call breaks.  Whether these policies exist, are deficient, and result in classwide (or subclass-wide) deprivation of legally compliant meal and rest periods are common issues that will not require scores of individualized proof or legal points to be resolved.  See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc., 311 F.R.D. 590, 611–12 (C.D. Cal. 2015) ("Courts routinely hold that proof of a defendant's uniform policy 'is not plagued by individual inquiry, but is often sufficient to satisfy the predominance requirement.'" (quoting Taylor v. Fedex Freight, Inc., No. 13-cv-1137-LJO-BAM, 2015 WL 2358248 (E.D. Cal. May 15, 2015))).

Against predominance for the on-call theory of liability, Leprino argues that Perez's meal and rest period claim has no single, cohesive issue.  Broadly, Leprino contends that Perez has not

shown any common method of proving why employees' breaks are interrupted.  It asserts that the critical question of any meal or rest period discrepancy is asking why an employee was on the clock during his or her break.  Here, Leprino contends, the answer to this question will rest on numerous and various individualized factors, as would inquiry into whether employees received another break or compensatory pay for any interrupted break.

This argument fails, however, in no small part because it mishandles Perez's theory.  The reason for each interruption to employees' many breaks is not the focus of Perez's claim.  Instead, the focus is on whether Leprino's enforces policies and practices that effectively place all putative class members on call during their breaks.  If the factfinder determines that to be so, then Leprino is liable across the board.  Said differently, if Leprino uniformly enforces on-call policies and practices, there are no individualized inquiries for liability because liability will be established for the entire class.  Moreover, while damages calculations stemming from classwide liability could require individualized inquiries,[10] this alone will not defeat certification.  See Leyva v. Medline Indus. Inc., 716 F.3d 510, 513 (9th Cir. 2013) (quoting Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir.2010)).  Wage-and-hour class actions, in particular, often produce individualized damages determinations.  Id. at 513−14 (citing Brinker, 53 Cal. 4th at 1054 (Werdegar, J., concurring)); see also Wal-Mart Stores, 564 U.S. at 362 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3).").

### 3.    Derivative claims

Leprino does not argue that the derivative claims fail the predominance test beyond disagreeing with the certifiability of the underlying claims.  As discussed above, Perez's off-the-clock and meal and rest period claims involve common questions that predominate.  The same is true for claims that are derivative of those ones.  Boyd, 300 F.R.D. at 442 (finding predominance

---

[10] Leprino gets at this point by highlighting that some employees may have previously been compensated for certain meal period violations.  The record does show that Leprino and the Union executed a memorandum of understanding regarding Leprino's agreement to compensate certain maintenance employees for interrupted meal periods occurring between January 1, 2013, and September 26, 2015.  Doc. No. 52-1 at 96.  Under this agreement, Leprino was to pay affected employees one hour of their regular rate of pay for each interrupted and uncompensated meal period.  Id. While evidence of this kind could come into play with individualized damages calculations, it does not alone require denial of certification for a claim founded on a common contention regarding an allegedly unlawful uniform policy.

1  for derivative claims).  Thus, to the extent the derivative claims are in fact derivative, these claims

2  satisfy the predominance requirement of Rule 23(b)(3).

3

4        **G.**    **Superiority**

5        Certification under Rule 23(b)(3) also requires a finding that "a class action is superior to

6  other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P.

7  23(b)(3).  To evaluate superiority, the court shall consider four "pertinent" factors:  (1) the class

8  members' interests in individually controlling the prosecution or defense of separate actions; (2)

9  the extent and nature of any litigation concerning the controversy already begun by or against

10  class members; (3) the desirability or undesirability of concentrating the litigation of the claims in

11  the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P.

12  23(b)(3)(A)−(D).  "A consideration of these factors requires the court to focus on the efficiency

13  and economy elements of the class action so that cases allowed under subdivision (b)(3) are those

14  that can be adjudicated most profitably on a representative basis."  <u>Zinser v. Accufix Research</u>

15  <u>Inst., Inc.</u>, 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller

16  & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1780, at 562 (2d ed. 1986)).  "A class action

17  is the superior method for managing litigation if no realistic alternative exists."  <u>Valentino v.</u>

18  <u>Carter–Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996).  In contrast, "[i]f each class member has

19  to litigate numerous and substantial separate issues to establish his or her right to recover

20  individually a class action is not superior."  <u>Zinser</u>, 253 F.3d at 1192.

21        Perez argues that class treatment is clearly superior, and Leprino does not substantively

22  address the issue in opposition.  The Court finds the Rule 23(b)(3) factors weigh in favor of

23  certification.  There is no indication that putative class members have any interest in individually

24  controlling the prosecution of separate actions.  Nor is there indication of other actions raising the

25  same issues based on the same facts or indication that there is another forum where an action of

26  this kind could be raised.  While managing a class is by nature more difficult than managing the

27  claims of a single plaintiff, there is no suggestion here that the proposed class would be

28  unmanageable.  To the contrary, these claims seem particularly apt for class adjudication through

1   use of records and data in Leprino's possession.  See Kamar v. Radio Shack Corp., 254 F.R.D.

2   387, 405 (C.D. Cal. 2008).  Finally, class litigation is superior here, as it often is in wage-and-hour

3   lawsuits, because "the individual damages of each employee are too small to make litigation costs

4   effective."  Wright, 2017 WL 9831398, at *12.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.   Perez's certification motion (Doc. No. 48) is GRANTED IN PART and DENIED

IN PART as follows:

a.   Consistent with the discussion above, Perez's off-the-clock, meal and rest

period, and derivative claims are CERTIFIED for class aggregation under

Rule 23(b)(3).

b.   Consistent with the discussion above, Perez's claim for meal and rest period

violations is NOT CERTIFIED for purposes of the theories of recovery for

which he did not carry his burden under Rule 23.

c.   The class is defined as follows:

All non-exempt hourly workers who are currently employed, or
formerly have been employed, as non-exempt hourly employees at
Leprino's Lemoore East facilities in Lemoore, California, at any
time within four years prior to the filing of the original complaint
until January 6, 2021.

d.   The on-duty meal period subclass is defined as follows:

All non-exempt hourly workers who are currently employed, or
formerly have been employed, as non-exempt hourly employees at
Leprino's Lemoore East plant in Lemoore, California, at any time
within four years prior to the filing of the original complaint until
January 6, 2021, and who worked at least one shift that included an
"on-duty meal period," otherwise described as a shift of continuous
work with a meal period taken on the clock or a "straight 8" shift.

e.   The separation wages subclass is defined as follows:

All persons who have been discharged from or quit their
employment as non-exempt hourly employees at Leprino's Lemoore
East plant in Lemoore, California, at any time within four years
prior to the filing of the original complaint until January 6, 2021.

f.   John Perez is APPOINTED as the class representative.

g.      R. Rex Parris and the Parris Law Firm are APPOINTED as class counsel.

2.      Leprino's request for leave to file a sur-reply in opposition to Perez's motion (Doc. No. 69) is DENIED;

3.      The parties must promptly MEET AND CONFER about the submission of a joint stipulated class notice and distribution plan.  Within twenty-one days of this order, the parties must FILE either a stipulated class notice and distribution plan or a notice that no stipulation can be agreed to.  If the parties cannot agree to a class notice or distribution plan, then Perez must FILE a proposed class notice and distribution plan within thirty-five days of this order, and Leprino shall have fourteen days following Perez's filing to FILE any objections, and Perez shall have seven days following Leprino's filing to FILE a reply.

3.      This case is REFERRED BACK to the assigned magistrate judge for further scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   January 6, 2021          _____

                                          SENIOR  DISTRICT  JUDGE